### JOY v. MORGAN.

(Court of Appeals of District of Columbia. Submitted November 20, 1923. Decided January 7, 1924. Rehearing Renied January 26, 1924.)

No. 1616.

1. Patents ⟂91(4)—Evidence held to show that junior party, who was first to conceive, was reasonably diligent.

In interference proceedings, evidence that junior party conceived invention about 7 years prior to senior party's entrance into the field, but, being compelled to support his family, could work on his conception only in the evenings, and that he repeatedly changed his employment in the hope of securing financial assistance, *held* to show that he was reasonably diligent at the time of senior applicant's conception, and continued so until his filing date.

2. Patents ⟂90(3)—No fixed rule for determining diligence in filing application.

There is no fixed rule by which diligence in filing an application after conception may be determined, and each case must turn on its own facts.

3. Patents ⟂90(3)—Matters considered in determining diligence.

Only reasonable diligence in filing an application after conception is required, and the situation of the inventor, his financial condition, the amount of work and money necessary to produce an actual reduction to practice, and his efforts to secure what is needed are all proper for consideration. It is not necessary that inventor should give all of his time to the development of his invention, or abandon his ordinary means of livelihood.

4. Patents ⟂90(3)—Delay to perfect crude conception commendable.

Persistent efforts to develop a crude conception are commendable, and will not be discouraged by a too strict application of the rule requiring diligence.

Appeal from the Commissioner of Patents.

Interference proceeding between Joseph F. Joy and Olive Eugenie Morgan, executrix of the estate of Edmund C. Morgan, deceased. From a decision for the latter, the former appeals. Reversed.

⟂For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Marshall A. Christy, of Pittsburgh, Pa., for appellant.

Charles M. Nissen and A. J. Crane, both of Chicago, Ill., for appellee.

Before SMYTH, Chief Justice, ROBB, Associate Justice, and MARTIN, Presiding Judge of the United States Court of Customs Appeals.

SMYTH, Chief Justice. In an interference between the application of Edmund C. Morgan and a patent to Joseph F. Joy, relative to a subcombination of a coal-loading machine or device, the Commissioner of Patents awarded priority to Morgan. His application was filed in 1910, and a division of that application in 1916. Joy filed in 1916, and secured a patent in 1919, while Morgan's application was pending. The issue is expressed in two counts, reading thus:

1. In a loading machine of the class described, a gathering mechanism including a substantially horizontally arranged finger and means to move the same in a fixed noncircular orbital path.

2. A gathering mechanism including a support, a driven shaft carried by said support, a disk rotatably geared to said shaft, a finger pivoted eccentrically on said disk, a bar carried by said finger, and a swiveled guide for said bar carried by said support.

Joy was successful before the Examiner of Interferences, but lost on Morgan's appeal to the Examiners in Chief. Both tribunals went into the matter with great thoroughness. The Commissioner contented himself with a short opinion, in which he affirmed the decision of the Examiners in Chief.

The Examiner of Interferences and the Examiners in Chief united in awarding conception to Joy in 1903, some 7 years before Morgan entered the field. On this point the Commissioner expressed no opinion, but placed his judgment upon the ground that Joy had not shown himself diligent at the critical time. In the holding that Joy is entitled to 1903 for conception we concur. The case turns chiefly on the point whether or not, all the circumstances considered, Joy was reasonably diligent at the time Morgan conceived, and continued so until his filing date. Relative to this the testimony is extensive. We can give no more than a brief résumé of it.

[1] The Morgan machine has never been built, nor has anything been done towards actually reducing it to practice. Disinterested experts testified that it was impractical under actual mining conditions. On the other hand, the Joy machine, as soon as completed, was placed in operation and proved satisfactory. For more than 20 years there was a demand in the coal industry for such a machine. It was the first to meet and satisfy the demand. A number have been built at great expense and are doing good work.

Joy, a very poor boy, went to work in the mines when he was 12 years of age, having at that time little education; but he was industrious and ambitious. When about 15 he took a correspondence school course in mechanical engineering. In 1903, when about 19, he conceived the invention in question, and, while at that time he had it in its essential subject-matter, it was in a crude form. The machine would dig some coal, and to that extent was workable; but, according to his

notion as a miner of experience, it was not sufficiently developed to be classed as a practical machine.

While we are concerned only with the period which commenced immediately preceding Morgan's entry into the field and continued until Joy filed, still it is not improper to point out that Joy did many things looking towards the development of the invention between the time of conception and 1910, when Morgan appeared. In 1903 and 1905 he made two drawings and discussed them with persons familiar with mining needs, and made a model between 1905 and 1906. Between 1907 and 1908 he worked in the evenings on drawings and sketches, being engaged during the day in the mines. Another model was made by him in 1909.

To actually reduce the invention to practice required much time and money. He was compelled to labor that he might support his wife and indigent father. Consequently he could give but little time to the machine. But if he could spare the time he was without the necessary money to procure material and facilities for the construction of the device. Not until the spring of 1910 was he able to get in touch with any one who could help him. This was some three months before Morgan's date of conception, which was July 27, 1910. He then secured a position as master mechanic with a coal-mining company, and succeeded in interesting the superintendent in his invention. This promised well for him, but very soon thereafter a strike occurred in an affiliated mine, which made it necessary for him and the superintendent to give all their attention to the mine with which they were connected. In the fall of that year, seeing what he believed would be a better opportunity to develop his invention, he sought and obtained employment in another mine, whose superintendent was favorably impressed with the invention, and authorized him to build a machine embodying it, if he could find sufficient material at the mine with which to do it; but he was unable to find the material. He withdrew from his employment in that mine in 1912, leaving behind a drawing and a model, which he had made while there.

We next find him superintendent of a coal mine, where he was able to earn a salary of $140 a month. The company which owned it, however, was not financially strong, and it was imperative that he should give every moment of his time to its affairs. Seeing no immediate prospect of developing his ideas at that place, he accepted a position with a large coal-mining machinery manufacturing company at a smaller salary, namely, $100 a month, in the hope that he might obtain there the chance which he so earnestly sought. Taking the place at $40 a month less than he was receiving in the position which he gave up was a great sacrifice for him, in view of the demands upon him and his ability to meet them; but he was willing to make it.

From a study of the company's machinery he got an idea which aided him to solve some of his difficulties. He communicated his views to the designing engineer of the company, who, perceiving the merit of his conception, referred him to some of the executives of the company. He saw them, but they refused him any assistance, and endeavored to discourage him from further prosecution of his thought. Their atti-

tude, it turned out, was due to the fact that they believed his machine would conflict with one their company was working on. But he did not yield. He was convinced, he said, that in time he could satisfy them of the merits of his idea. He continued to give his best efforts to the duties of his employment with the manufacturing company, but still kept his own machine in mind, and whenever opportunity permitted he sought aid, either by discussing the matter with others or by soliciting an opportunity to embody his ideas in a structure.

In 1915 he was authorized by the company to superintend the installation of one of its machines at mine No. 2 of the Pittsburgh Coal Company. While engaged in that work he met a friend who had helped him to prepare one of the models heretofore referred to, and explained to him what he had decided upon with respect to a certain part of the invention. After the machine which he had been sent to install had been put in place, he and his friend constructed a model embodying some of his latest ideas. As a result he reached the conclusion that he had a practical form of machine, capable of accomplishing the purpose which he had in mind. But still he was without money with which to construct it. He sought a former acquaintance, who had been successful in the coal-mining business, and exhibited the last-mentioned model with a view of obtaining financial aid. Joy, being convinced from his various experiments that he had the conception of a complete machine that would work, tendered his resignation to the manufacturing company. But one of the officers of that company, knowing something about the progress which he had made in the development of his conception, offered him a larger salary if he would remain. At this time a falling out occurred between him and the acquaintance who was to assist him, and he accepted the company's offer, feeling, however, that now he would be able to interest that company in his invention. He showed his last model to the chief engineer of the company, who suggested that he exhibit it to some of the other officials. He did so, but their general disposition toward it was still discouraging. The engineer, however, gave him a letter of introduction to the chief engineer of the Pittsburgh Coal Company, who, upon seeing the model, said it seemed to be just what his company was looking for, and introduced him to the vice president of the company, who sent word to the manufacturing company, Joy's employer, that he would like them to proceed with the construction of a machine in accordance with Joy's model. This was in the latter part of 1915. The construction of the machine was entered upon and proceeded with in the usual way, but was not completed until the latter part of September, 1916. Commenting upon this the Examiner of Interferences said:

"It took almost a year for the Jeffrey Company [the manufacturing company] to build a small part of the completely practical machine and to barely reduce to practice the subcombination in issue, using parts furnished by the Pittsburgh Coal Company, and the continual services of the inventor. Under such circumstances it is conceivable that a relatively poor man might easily require more than six years, devoting due time to earning a livelihood, and by the exercise of a high degree of diligence fail to complete the details of a practical loader to the extent of justifying an application for patent, even though he had a conception of its most vital subcombination."

The machine, after it was built, was tried out, and the results were so satisfactory that the coal company proceeded to have additional machines built in acordance with the Joy model, and then Joy caused his application to be filed.

The first machine constructed cost $22,000, and there was spent in its further development and modification $175,000. This shows the large amount of money which was necessary to achieve an actual reduction to practice. Joy, as we have said, did not have it, and, while he sought in every direction in which it seemed likely that he would be able to procure it or its equivalent in material and facilities, he failed until he met the Pittsburgh Coal Company. He lost no opportunity to avail himself of any assistance which presented itself. What more could he have done in the circumstances? We cannot conceive of anything.

It is said that, while he was working on the invention, he found time and money sufficient to enable him to file applications for other inventions. That is true. But the inventions were simple, and little money was required. Besides, he gave attention to those inventions on the advice of his attorneys that he might through them secure money enough to enable him to proceed with the development of the coal-loading device. This course on his part may be treated as a step toward the reduction of the device to practice. It works for him, not against him.

[2-4] We have declared more than once that there is no fixed rule by which diligence may be determined in all cases. Each case must be turned on its own facts. Burnett v. Utsman, 46 App. D. C. 407, 410; Jobski v. Johnson, 47 App. D. C. 230; Sargent v. Vetter, 48 App. D. C. 582, 585. Only reasonable diligence is required in any case. The situation of the inventor, his financial condition, the amount of work and money necessary to produce an actual reduction to practice, and his efforts to secure what is needed to accomplish his purposes, are all proper to be taken into consideration. Dickinson v. Swinehart, 49 App. D. C. 222, 263 Fed. 474; Walser v. Scott, 52 App. D. C. 232, 285 Fed. 966. It is not necessary that the inventor should give all his time to the development of his invention, or abandon his ordinary means of livelihood. Courson v. O'Connor et al., 227 Fed. 890, 142 C. C. A. 414; Dickinson v. Swinehart, supra. Nor will persistent efforts to develop an invention, as here, be discouraged by "a too strict application" of the rule requiring diligence. Sargent v. Vetter, supra. Delay for the purpose of the elaboration and perfection of a crude conception may well be commended, and we have had occasion to express such commendation. Platt v. Shipley, 11 App. D. C. 576.

A careful survey of the record in the light of these decisions satisfies us that Joy exercised due diligence in his efforts to reduce the invention to practice before he filed.

It is asserted that he might have secured a constructive reduction to practice by filing an application before Morgan appeared on the scene. That is true. He says he did not file, because he thought an application should not be filed until his invention had been sufficiently developed to be a commercial success. While he was mistaken in this, it explains his failure to file. As we have just said, this court has com-

mended the course of those who refuse to rush to the Patent Office before the merits of their invention have been tested. Platt v. Shipley, 11 App. D. C. 576, and Yates v. Huson, 8 App. D. C. 93. Morgan filed as soon as he conceived the invention, while Joy waited until he was certain he had a device that would satisfy the demand of the coal-mining industry, and advance the public interest. We think his course should be approved. However, as he exercised due diligence in actually reducing the invention to practice, his failure to secure a constructive reduction to practice is immaterial. Walser v. Scott, supra.

Joy urges that Morgan, because of laches, lost his right to make the claims prior to Joy's filing date; but, in view of the conclusion we have reached, we do not find it necessary to consider this question.

Taking the case as we see it, we feel constrained to reverse the decision of the Commissioner; and it is so ordered.

Reversed.