## ECLIPSE MACH. CO. v. E. KRIEGER & SON, Inc.

### No. 7036.

District Court, E. D. New York.
April 21, 1936.

98

Thomas J. Byrne, of New York City (William B. Kerkam, Loyd H. Sutton, and Ralph H. Hudson, all of Washington, D. C., of counsel), for plaintiff.

Pennie, Davis, Marvin & Edmonds, of New York City, and John A. Marzall and Roy H. Olson (of Cox & Moore), both of Chicago, Ill. (Dean S. Edmonds and George E. Faithfull, both of New York City, of counsel), for defendant.

CAMPBELL, District Judge.

This is a suit for alleged patent infringement involving two patents.

The first patent in suit is No. 1,254,196, issued to Carl Bergmann, Jr., for automatic clutching or starting device, granted January 22, 1918, on an application filed December 23, 1916. This patent expired on January 22, 1935, after the bill of complaint herein was filed in 1933.

The second patent in suit, No. 1,527,588, issued to William O. Kennington, assignor, by mesne assignments to Eclipse Machine Company, for gearing for starting internal-combustion engines, granted February 24, 1925, on an application filed May 13, 1915.

Plaintiff, Eclipse Machine Company, is a manufacturer of engine starter drives, among other things, and defendant, E. Krieger & Son, Inc., is a distributor of the infringing device which is known as the "Charter Drive."

It is admitted that defendant sold the accused structures in this district within six years prior to the institution of the present suit.

The drive which is sold by defendant is manufactured by Burgess-Norton Manufacturing Company, Geneva, Ill., which company is the exclusive licensee of Charter Drive, Inc., the owner of the legal title to Charter patents Nos. 1,554,623 and 1,920,187, dated August 1, 1933, which latter patent it is stipulated illustrates and describes the devices complained of.

Plaintiff is the owner of both of the patents in suit, and notice of infringement of both of the patents in suit was given to the defendant before the institution of this suit.

Defendant has interposed an answer setting up the defenses of invalidity and non-infringement as to both patents in suit.

I will consider the patents in suit in the order named.

First Patent No. 1,254,196 to Bergmann.

█ This patent has never been litigated heretofore. It expired on January 22, 1935, approximately a year and a half after the bill of complaint herein was filed. Therefore no injunction can issue as prayed for in the bill of complaint herein as to said Bergmann patent, even if the patent be found to be valid and infringed, but plaintiff is entitled to proceed on its claim for an accounting for alleged past infringement.

█ The Bergmann patent relates to starters for automobile engines of the automatic mesh and demesh type, wherein a driving pinion normally out of mesh with the engine flywheel is automatically translated along a shaft by virtue of a helical relationship therewith into driving relation with the flywheel, and is automatically translated along a shaft in the opposite direction to demesh the same from the flywheel when the engine starts and operates under its own power.

The Bergmann patent has expired. The devices disclosed in this patent never appeared on the market, and plaintiff, the owner of the patent since its issuance, never made and sold commercially the devices disclosed in this patent, nor did it ever mark any starter drives manufactured and sold by it with the number of the patent. It is definitely in the paper patent class.

Claims 1 and 2 of this patent are in suit and claim 1 reads as follows: "1 A driver shaft, an axially movable driving part upon said shaft, a coiled spring, a complementary driven part, and means for producing relative axial movement between said shaft and one of said spring and driving part to bring said driving part into engagement with said complementary driven part."

Claim 2 differs from claim 1 only in that it calls for a coiled spring of polygonal material. This is a feature which is shown

in the prior Bendix patent, No. 1,258,302, which was sustained by this court. Eclipse Mach. Co. v. J. H. Specialty Mfg. Co., 4 F. Supp. 306.

This feature does not add any patentability to claim 2 over claim 1.

Defendant offered in evidence 15 alleged prior art patents, but I see no necessity for analyzing them separately, as both claims are fulfilled in all respects by all of such prior art patents, except patent No. 728,949 to Mason.

I do not agree with plaintiff's counsel that in substance each of the claims in suit is alternative in the sense that it covers each of two different specific forms of the invention.

The claims were drafted to include Figs. 1, 2, and 3 of the patent in suit, but plaintiff seeks to have this court interpret the claims in suit as covering only Fig. 3. This cannot be done. White v. Dunbar, 119 U.S. 47, 51, 52, 7 S.Ct. 72, 30 L.Ed. 303; Keystone Bridge Co. v. Phœnix Iron Co., 95 U.S. 274, 278, 24 L.Ed. 344; McCarty v. Lehigh Railroad Co., 160 U.S. 110, 16 S.Ct. 240, 40 L.Ed. 358; Altoona Publix Theatres, Inc., v. American Tri-Ergon Corp., 294 U.S. 477, 487, 55 S.Ct. 455, 79 L.Ed. 1005.

While it is true that the courts have on a few occasions, in order to save a meritorious invention, interpreted claims in such a manner as to restrict them, to the structure disclosed in the specification, that would not be sufficient nor is it what is requested to save the claims in suit. To save the claims in suit, it would be necessary to go much further than that, in that they must be restricted to one of the three forms shown in the application. Even if we were dealing with a meritorious invention, this would not be permitted, and it cannot be done in this instance, where the patent is a mere paper patent and the structures disclosed therein are impractical. No merit can be ascribed to the patent by pointing to the defendant's device, as the record clearly shows that defendant has not adopted any of the forms shown in the Bergmann patent and that its devices operate on a different principle. This may not be done, for the further reason that, when the grant of the broad claims in suit was solicited, the Patent Office suggested that claims limited as plaintiff now proposes be presented, and this suggestion and invitation by the Patent Office was rejected in Bergmann's behalf. Broad claims free from the suggested limitation were insisted on and were what the libelant wanted.

Smokador Mfg. Co., Inc., v. Tubular Products Co. (C.C.A.) 31 F.(2d) 255, cited on behalf of the plaintiff, is not in point, but clearly distinguished, as in that case it was made clear by the whole specification that what the patentee intended to cover and what he considered as his advance in the art was the use of a glass container, but the claims did not contain a definite limitation to the glass container. An actual advance having been made by the patentee and the specification having clearly indicated that the use of the glass container was the invention advance, the court interpreted the claims as covering the use of the glass container. There were other facts in that case which must have had weight with the Court in arriving at its decision.

Wachs et al. v. Balsam (C.C.A.) 38 F.(2d) 50, 52, cited on behalf of plaintiff, is not in point, but clearly distinguished as in that case the issue was not of making over claims, but the ordinary one of patent infringement and the determination of whether what the plaintiff had done was an equivalent of what was claimed.

Claim 1 of the Bergmann patent in suit is anticipated by the Kennington patent, No. 1,527,588, in suit, Bendix patent, No. 1,124,264, and Bijur patent, No. 1,561,685, and, as I have hereinbefore found that claim 2 is literally the same as claim 1, except that it calls for a spring of polygonal cross-section, a feature which is shown in the prior Bendix patent, No. 1,258,302, and does not add any patentability to claim 2 over claim 1, therefore claim 2 is likewise anticipated by the same patents.

The Bergmann patent, No. 1,254,196, in suit, is invalid as to claims 1 and 2.

Second Patent No. 1,527,588 to Kennington.

This patent relates to a starting device for automatically starting internal combustion engines, and discloses the combination of a motor with an armature, having a period of free rotation or free running start, in combination with a pinion that is carried by, and has a helical relationship with, the armature shaft of the motor, whereby it is automatically meshed with a gear of the engine to be started, and means for controlling the rate of deceleration of the rapidly rotating armature and associated parts caused by the establishment of the driving connection between the motor and engine, whereby the deceleration torque is utilized to assist the electrical torque of the motor

in the work of turning over the engine to be started.

The construction and operation of the device illustrated in the Kennington patent in suit with respect to the starting structure and function thereof is as follows: A starting motor 11, having an armature 14, and referring to Fig. 4 particularly, an extension of the armature shaft 26 with which there is associated in helical driving relationship a pinion 27 adapted to be engaged with the engine gear 24. When the electric motor begins to operate, it starts off with a very high acceleration, and the rotation of the armature and associated extension of the shaft causes the pinion to travel longitudinally to the left into engagement with gear 24, since the pinion does not tend to rotate with the shaft immediately, both because of its inertia and because of the assistance of the spring-pressed friction arms 31, which arms are not present in the commercial embodiment of Exhibit 20; in that case the inertia resistance to rotation of the pinion being depended upon to cause longitudinal movement of the pinion.

After the pinion has traveled to the left into engagement with the flywheel gear during the period of free running start of the electric motor, it begins to be arrested when it comes in contact with the washer 28 backed up by the spring 30. In the case of the commercial embodiment, the spring has no washer ahead of it; the pinion contacts the spring direct. This spring is compressed from this beginning of the arresting of the pinion movement or the beginning of the deceleration period until its compression equals the longitudinal component from the screw-thread action between the shaft and the pinion. The helical relation between the two I have referred to in this case takes the form of a narrow thread. At that time is encountered the beginning of the driving relationship, the flywheel begins to rotate, and in such rotation ultimately starts the engine. When the engine starts of its own power, the pinion 27 being driven from the gear 24 faster than it is being driven from the armature shaft, the pinion will be constrained to travel to the right and, due to the operation of the helical relationship action between the two, out of mesh with the flywheel gear. During that period that the pinion is being rotated both while it is in and when it comes out of mesh, the arms 31 have flown out on their hinged connection against the resistance of the spring 32 so that they do not interfere with such demeshing

of the pinion. Those arms I have previously referred to are not present in the commercial embodiment; the inertia resistance to rotation having been found sufficient.

The application for the Kennington patent in suit was filed May 13, 1915. Plaintiff contends that this application was a continuation in part of a joint application filed May 25, 1912, by McDermott & Kennington. Each of these applications discloses a transmission for an engine starter of the automatic mesh and demesh type, and in each the starter is provided with a spring. There are, however, differences between the two applications, both as to what is illustrated in their drawings and as to the disclosures in the application as filed, which differences concern the elements that are the critical ones in this controversy. As an instance in the McDermott & Kennington, drawing the spring is illustrated as not compressed at all by the movement of the pinion, whereas in the Kennington application and the patent in suit the spring is illustrated as substantially compressed by the pinion. Defendant contends that, because of these differences of illustration and description, the patent in suit may not properly be considered a division or continuation of the earlier filed McDermott & Kennington application.

Prior to the filing of either of these applications, that is, on March 13, 1912, Bijur filed an application disclosing and claiming broadly a transmission for an engine starter of the automatic mesh and demesh type. Patent No. 1,095,696 issued on this application on May 5, 1914. The joint McDermott & Kennington application was placed in interference with this Bijur patent on broad claims for the automatic mesh and demesh starter; claims making no mention of the spring. Testimony taken in this interference by McDermott & Kennington in March, 1915, disclosed that McDermott took no part in originating the main features of the starter of the joint application, that having been the work of Kennington alone, and accordingly the Kennington sole application in the interference. This interference terminated in July, 1916, with a final judgment in favor of Bijur after decision by the Examiner of Interferences; Kennington having failed to prosecute an appeal from that decision. Shortly thereafter all claims relating to the broad automatic mesh and demesh feature were canceled from the Kennington application. The Kennington application was thereafter necessarily limited to such additions as Kenning-

ton claimed to have made to a transmission of the automatic mesh and demesh types. These additions included principally a certain type of spring. We are not here concerned with other minor features.

Kennington in his specification, after broadly describing the automatic mesh and demesh type starter, describes the spring as follows: "Near the left hand end, the shaft 13 has an externally threaded portion 26 and the extreme outer end of the shaft is reduced in diameter. An internally threaded pinion 27 is screwed on to the threaded portion 26 of the shaft 13 and its movement to the left towards the end of the shaft is limited by means of a collar 28 which surrounds the shaft and is free to slide thereon. A collar 29 is secured upon the end of the shaft with a spring 30 surrounding the shaft and lying between the collars 28 and 29, said collars and spring serving as a spring buffer to gradually stop the outward movement of the pinion 27."

With reference to the operation the specification states that, after the teeth of the pinion have become engaged with the teeth of the engine gear, "the pinion continues to travel longitudinally of the shaft 13 until it strikes the buffer collar 28 which gradually stops its further movement."

Up to this point there has been described no more than the function of the spring to take up the shock due to the longitudinal momentum obtained by the pinion in its axial movement along the shaft. This constituted the sole description of the spring in the joint McDermott and Kennington application.

There is described in the Kennington patent, but not in the prior McDermott and Kennington application as filed, a further function of the spring: "The ability of the collar 28 to yield permits such further movement of the pinion 27 on shaft 13 as may be necessary to cushion the shock due to the strain of the starting gear 24 and the engine. The pinion 27 will not start gear 24 until the pinion is thus yieldingly stopped by collar 28. This permits some play between the shaft 13 and the starting means."

Reference to this second function is also found in the opening part of the specification: "The invention also includes the provision of means for cushioning or yieldingly stopping the pinion in its travel along said shaft so as to cushion the shaft of the mechanism when starting the engine."

These four quotations comprise the entire disclosure of the specification of the Kennington patent in suit upon which the present claims 10, 11, and 12 are based. The spring is described as serving two functions: (1) To act as a buffer for the pinion; and (2) to cushion the shock due to the strain of starting the engine.

This second function is frequently referred to as that of a yielding drive, and the spring performing this function as a yielding driving connection.

The spring claims contained in the Kennington application up until 1922 were directed to means for performing both of these two functions described in the specification. These claims were original claims 1 and 2 on page 19 of Plaintiff's Exhibit 1 and the claims 1 to 5 and 8 now appearing in the Kennington patent.

They were all limited to means for "yieldingly stopping" the pinion. After 1922, claims directed broadly to the second function of a yielding drive and not limited to the type of spring disclosed by Kennington were asserted. The claims in suit, claims 10, 11, and 12, find their origin in claims inserted after 1922.

The Examiner in finally rejecting the claims added to the application after 1922 said: "The appealed claims are drawn to * * * a spring forming a yielding driving connection between the pinion and shaft, but omitting the feature of cushioning the impact of the pinion. In other words, they are drawn to any means of introducing yielding driving connection in the gear shown by Bijur. * * *"

The claims in suit are 10, 11, and 12.

Claim 10 reads as follows: "10. In combination with a starting motor and a rotatable member of an engine to be started, a driving connection interposed between the motor and engine member and including a driving member movable into driving relation with said engine member and means automatically yieldable in conformity with the resistance of the engine member to rotation for gradually building up torque to overcome said resistance."

Claim 11 specifies "means permitting the motor to be accelerated before the establishment of the driving relation and means prolonging the period during which initial torque is built up to include time subsequent to the establishment of the driving relation."

Claim 12 specifies "a rotatable shaft, a driving member mounted thereon for rotary movement therewith and longitudinal movement thereof into engagement with the

engine member, and means for building up the torque beyond the normal torque of the starting means."

In every engine starter the torque is built up to overcome the resistance of the engine member to rotation; in some, the building up is more gradual than in others. There is no reference in the specification of the Kennington patent in suit to the terms "normal torque, initial torque," nor is there anything to tell with respect to claim 10 what the torque is that is gradually built up to overcome the resistance of the engine member to rotation nor what is meant by gradually. Also no guide is given in the specification to determine what is the meaning of the terms used in claim 12 in speaking of normal torque of the starting motor. And it is also not clear from the specification just what the time is of the "establishment of the driving relation" specified in claim 11. According to my understanding, a starting motor has no normal torque; its torque varying between zero and a maximum representing the torque exerted when the resistance encountered results in stalling the motor.

The defendant urges the following defenses against the Kennington patent in suit: (1) Estoppel; (2) prior invention by Bendix; (3) laches; (4) anticipation and lack of invention; and I will consider them in the order named.

The first, estoppel, is based upon defendant's contention (a) that the Bendix patent 1,124,264 and the claims in suit of the Kennington patent are based upon and purport to cover the same concept of using a yielding driving connection in an engine driver; (b) that the Kennington application and patent were controlled by plaintiff during substantially the entire life of the Bendix patent 1,124,264; (c) that plaintiff during the entire life of the Bendix patent, and while it also had control of the Kennington application and patent, asserted the validity of the Bendix patent before the public, secured substantial acquiescence of the trade in the validity of the Bendix patent, and sued under that patent those few small concerns who dared invade the monopoly secured by the patent.

That the Bendix patent 1,124,264 and the claims in suit of the Kennington patent are based upon and purport to cover the same concept of using a yielding driving connection in an engine starter seems to me to be beyond question.

That, however, is not alone sufficient to establish the defense of estoppel.

 It is undoubtedly true that the plaintiff is most anxious to continue the monopoly which it enjoyed under the Bendix patent 1,124,264, and it seems to me that, in determining whether such monopoly should be continued, the court should guard with care the rights of the public, but, as I view the situation presented, the plaintiff should not be prevented from litigating the issues of validity and infringement of the Kennington patent in suit for the following reasons:

The Bendix patent 1,124,264 issued in January, 1915. The application for the Kennington patent in suit was executed on May 4, 1915, and on the same day the Remy Electric Company became the owner of the Kennington application and assigned it to Bendix and the Eclipse Company jointly. The application was filed on May 13, 1915. Bendix and the Eclipse Company were record holders of the Kennington application until February 3, 1922, when Bendix assigned all his interest in the application to the Eclipse Machine Company, which has been the record owner from that day to the present.

 The Eclipse Machine Company was the exclusive licensee of the Bendix patent 1,124,264, but never the owner of that patent, and could not as a matter of law during the time it was licensed contest the validity of the patent under which it was licensed.

Title to the Bendix patent 1,124,264 first passed to the Bendix Engineering Works, then to the Bendix Corporation, and then to the Bendix Aviation Corporation.

We therefore find that there was no common ownership of the two patents.

For these reasons it does not seem to me that the defense of estoppel can be maintained.

 I will next consider the defense of prior invention by Bendix.

This defense is based upon, and supported by, the proofs offered on behalf of Bendix in various interferences in which Bendix patents were involved, particularly Interferences Nos. 38,567 and 38,568, involving the Bendix patent No. 1,124,264.

The testimony taken and proofs offered establish that Bendix conceived the invention of the automatic mesh and demesh starter of the type provided with a spring constituting a yielding driving connection,

and made drawings illustrating embodiments of it in 1909 and 1910.

Plaintiff contends that Bendix must be held to have forfeited any claim to a date of invention in any of the years 1909, 1910, 1911, and 1912 by reason of lack of diligence in and about the year 1912 when Kennington's first efforts occurred.

Plaintiff further contends that Bendix did not produce an operative starter embodying the alleged invention until after Kennington had produced one, and that this fact, together with the asserted lack of diligence by Bendix in and about 1912, is sufficient to sustain a holding that Bendix was not the first inventor.

Of course, the Eclipse Machine Company as the exclusive licensee was interested and took part in the interferences.

The most important of the several interferences with Bendix as a party is No. 38,567, based on claims 1 and 4 of Bendix patent 1,124,264 issued in January, 1915.

That the Eclipse Machine Company displayed a community of interest and participated in joint action to maintain Bendix's claim to priority, both by counsel and patent assistants and engineering assistants, is beyond question.

At all times and in all proceedings in interferences and otherwise, during the life of the Bendix patent 1,124,264, the plaintiff asserted the priority of the Bendix patent over the Bijur patent, and the dates claimed by Bijur were prior to any dates even claimed by Kennington.

Bendix conceived the invention in 1909, and was diligent in reducing the invention to practice.

This was asserted by the plaintiff until the time that the Bendix patent in question expired, although it was the owner of the Kennington patent, and, if that patent was entitled to priority, that fact was not seriously contended for by the plaintiff at that time.

It is not necessary for me to hold that the plaintiff is bound by the position it took at that time, as there is sufficient evidence on which this case may be decided without resorting to the actions of the plaintiff at that time.

Bendix was diligent from a time prior to Bijur's entry into the field in November, 1911, continuously up to the date of the filing of the Bendix application in November, 1913.

Kennington's alleged date of conception in January, 1912, is the earliest date of invention claimed for him.

The Patent Office tribunals and the Court of Appeals, in the Bendix interference 38,-567, held specifically that Bendix was diligent from the fall of 1912 continuously up to the filing date of the application by Bendix in November, 1913. No more was necessary then to be determined in deciding the interference in favor of Bendix, as the earliest dates asserted for Halbleib and Conrad were in the spring of 1913, and, Bijur's asserted reduction to practice in May-June, 1912, having been rejected, he was relegated to the date of filing his application in November, 1914, as his date of reduction to practice. See Exhibits 9 and 10 and Halbleib v. Bendix, 50 App.D.C. 247, 270 F. 683.

Plaintiff now contends that Bendix was not diligent, notwithstanding the fact that it enjoyed a monopoly for most, if not all, of the life of the Bendix patent under the claim that he was diligent.

I have examined the evidence with care, but neither time nor space warrants a recital of all of the evidence. Summarizing it, however, it shows that in November, 1911, Bendix was many thousands of dollars in debt, his credit exhausted, compelled to borrow from his wife to meet ordinary living expenses and attempt to make a living, going from one unprofitable employment to another in his efforts to avoid bankruptcy; that Bendix was wrecked financially, and unable to pay the expense of filing a patent application, or of constructing a practical working device; that he repeatedly tried to induce his attorney, Jacker, to trust him to the extent of filing a patent application, and constantly sought the aid of friends and business associates with respect to his screw-shaft invention; that his efforts were unremitting to procure either the filing of a patent application or mechanical embodiment of his conception of the screw-shaft drive, which from the outset included the yielding driving connection, the invention in controversy.

By the evidence I am convinced that Bendix was diligent from the conception of his invention in 1909 to the date of the filing of his patent application in November, 1913.

There is no fixed standard, and the question of whether the inventor has used reasonable diligence must be determined from all of the circumstances of the particular case, and, applying that test to the facts

in the case at bar, it seems to me that my determination that Bendix was diligent is amply supported by authority. 48 Corpus Juris, p. 117, par. 131; Courson v. O'Connor (C.C.A.) 227 F. 890, 894; Joy v. Morgan, 54 App.D.C. 110, 295 F. 931; Wayne v. Tew, 53 App.D.C. 336, 290 F. 311.

██ Plaintiff discusses what it contends are the two different rules relating to the time when the diligence of an inventor must start, and cites many cases, but there is no necessity for reviewing them, as I have found that Bendix was diligent from the time of his conception of the invention. There is no difference in the rule to be applied when poverty is one of the circumstances to be taken into consideration.

The cases cited on behalf of the plaintiff to show lack of diligence relate to situations which are clearly distinguishable from the hereinbefore described situation in the case at bar, in that in some of them there was long-continued and unexplained inactivity, and in others nothing more was done by claimant than to make drawings and make some slight attempt to commercialize the disputed invention, and no sincere effort was made to file a patent application.

██ It is plainly shown that Bendix conceived the subject matter of the claims in suit before Kennington, and that Bendix actually reduced to practice before Kennington, but plaintiff contends that there was a constructive reduction by Kennington prior to the actual reduction to practice by Bendix. The asserted constructive reduction to practice consisted of the filing of the joint McDermott & Kennington application on May 25, 1912, but the evidence does not support that assertion. As I read that application, so filed, it contains no disclosure of the invention of the claims in suit, and no court and no Patent Office tribunal or official has held that such application constitutes such a reduction to practice of the alleged invention of the claims in suit.

The Kennington claim of constructive reduction to practice, prior to the actual reduction by Bendix, must stand or fall on the disclosure of the joint application, as filed, and not on the disclosure of the joint application in its changed condition, when the Kennington sole application was filed in May, 1915. The changes appear to me to be very substantial. As I read the joint application as filed, it contained no disclosure of the alleged invention of the claims in suit, such disclosure found its way into the joint application later by amendment, and

the only disclosure of the subject matter of the claims in suit, found in the specification of the Kennington patent, consists of the additional disclosure made by amendment of the joint application, long after it was filed. The vital description of the function of the yielding drive which was absent from the application as filed was added in 1914, and this change occurred after Kennington had built a device in the fall of 1913, which device departed from the disclosure of the joint application as filed in the same vital respect as does the Kennington patent in suit from the disclosure of the joint application as filed.

In the joint application as filed there is ascribed to the spring the function only of a buffer, for arresting the longitudinal movement of the pinion along its shaft. In the patent in suit, the specification contains references to the other function of the spring; that is, cushioning the starting of the engine shaft, stated by plaintiff as developing deceleration torque. One of these references did get into the joint application later, but that was by the amendment filed on March 6, 1914.

The joint application as filed did not contain any description in words, nor any disclosure in drawings of any function or capacity, for functioning of the spring, other than as a buffer.

Whatever may have been held as to the joint application as filed, being a constructive reduction to practice, it could only relate to the disclosure of that application and not to the additional disclosures by amendment of the joint application or the sole application, and certainly not to the new claims presented in 1922, covering broadly the yielding drive function.

Actual reduction to practice by Bendix, long prior to Kennington, is clearly shown in the proof in interferences 41,508, 38,567, and 38,568, and this proof is not weakened by plaintiff's claim of actual reduction to practice by Kennington late in October, 1913, as it clearly appears herein that what Kennington had done in October and November, 1913, Bendix had done several months earlier, for instance in 1913, with reference to Clock type torsion spring built in August and used in September on Page car (Tr. pp. 782–783), construction like Fig. 1 of No. 1,116,370 and Fig. 8 of No. 1,124,264 (Tr. p. 784), which clock-type transmission embodies the subject matter of the claims in suit.

While plaintiff argues freely about the several decisions rendered in the Bijur-Bendix interferences 38,567, 38,568, and the Bijur-Kennington interference 41,508, I see no reason for any extended consideration here, as in those interferences there was no necessity for any tribunal to determine, nor did they determine, upon a specific or approximate date of reduction to practice by Bendix. The decisions were on other issues, among them, the diligence of Bendix over a stated period of time sufficient to entitle him to priority, and the failure of Bijur to prove any reduction to practice prior to the filing of his application in 1914.

The installation of starters by Bendix throughout 1913 with various types of springs on various cars and his strenuous efforts to induce manufacturers to adopt his yielding drive starter have been shown, and those tests developed directly and continuously into the largely used commercial form of starter.

Kennington built two starters of the compression spring type in October, 1913, and installed them on a Cadillac and a Duro car; but was unable to make them work with any regularity until November 10, 1913. Bendix had done at an earlier date all that Kennington did and more.

Bendix was the prior inventor, prior in point of concept and prior in reduction to practice.

The defense of laches does not require any extended consideration.

The defendant never acquired any intervening rights, as it did not commence to sell the alleged infringing structure until some years after the patent issued, and failure of the plaintiff to prosecute its patent application more vigorously in the Patent Office or to pursue more vigorously alleged infringers after the grant of the patent did not change the situation of the defendant or in any way interfere with its defense, and the defense of laches has not been sustained.

We now come to the last defense, that of anticipation and lack of invention.

German patent No. 223,460 to Vogtland Machine Works for auxiliary driving device for rotary printing presses issued June 23, 1910, was not cited by the Patent Office during the prosecution of the Kennington application. It is directed to a starter for a large machine, such as a rotary printing press, and discloses an automatic meshing and demeshing gear for connecting a starter motor to the parts to be started and springs for effecting a yielding driving connection. As shown in Fig. 1, the starting motor b drives a gear (unlettered) at the extreme left of the figure, through a magnetic coupling or brake a, and a reduction gear c. The pinion or driving member 1 is mounted on a separate shaft 2 and is shown in partial engagement with the gear driven by the starting motor. Below the pinion 1, there is an engine member 22, on which is rotatably mounted, a ring gear 21; the rollers 23 attached to the engine member 22 serving to sustain the ring gear in position. It will be noted that the driving member or pinion 1 is shown out of engagement with the ring gear 21 on the engine member 22. The movement of rotation of the ring gear 21 on the engine member 22 is limited by pins 29 on the engine member 22, which fit into slots 28 in the ring gear. This is more clearly shown in Fig. 2. Still referring to Fig. 2, two springs 26 are shown, one end of each spring attached to the engine member 22 at the points marked 24 and the other ends being attached to the rotatably mounted ring gear at the points marked 27. The springs oppose rotary movement of the ring gear on the engine member in the direction to start the parts to be driven. When the starting motor is started, the driving member or pinion 1, on shaft 2, is rotated through the reduction gearing c and the unlettered gear at the left in Fig. 1. At this point, the pinion is out of engagement with the ring gear 21 on the engine member 22, so the rotation of the pinion is accelerated by reason of the absence of any resistance. The driving member 1 is drawn to the right into engagement with the ring gear 21 by means of a screw thread on the shaft 2 which carries the pinion. The bolt 19 is normally held out of engagement with the thread 3 on the shaft 2. When the starting motor is connected, the magnets 10 are energized and the bolt 19 is pressed into engagement with the thread 3. Thus the rotation of the shaft 2 with the bolt 19 engaging the thread 3 causes the shaft to be drawn to the right, and this movement of the shaft carried the driving member 1 mounted thereon into engagement with the ring gear 21.

In operation when the rotating driving member 1 comes into engagement with the ring gear 21, the driving torque is yielding applied to the engine member 22 by reason of the yielding driving connection consist-

105

ing of the springs 26 between the ring gear 21 and the engine member 22. If the resisting torque is very great, the resistance of the springs 26 may be overcome to such an extent that the pins 29 on the engine member 22 reach the ends of the slots 28 on the ring gear and there will be a positive drive; until this happens, the springs act as a yielding driving connection. If the resisting torque is not so great, the drive will be entirely through the springs. Thus there is a yielding driving connection which takes up the initial shock of starting the engine member, and the torque applied to the engine member necessarily consists of both the electrical torque of the motor and deceleration torque due to the building up of kinetic energy of rotation in the motor and connected rotating parts.

The driving member 1 is drawn into engagement with the ring gear 21 by reason of the rotation of the shaft 2, upon which it is mounted. There must therefore be some rotation of the engine member 1 and the motor by which it is driven before engagement and application of the driving torque occurs. While the distance between the driving member 1, and the ring gear 21 on the engine member 22 is not very great, and thus only a slight rotation of the driving member 1 will bring it into its driving relationship, this does not mean that the starting motor does not have a substantial period of free rotation. Due to the reduction between the driving member 1 and the unlettered gear by which it is driven and the further reduction gearing c between the unlettered gear and the motor a, a large rotational movement of the motor will be required to cause only a slight rotational movement of the driving member 1. Inasmuch as it is only a matter of milliseconds before an electric motor obtains its full speed, it is inevitable that in the starter of this German patent a substantial amount of kinetic energy of rotation of the motor armature will be built up before meshing of the gears 1 and 21 occurs.

A reference to plaintiff's curves of the alleged Kennington starter (Exhibit 31) indicates that the period of free rotation consists of one revolution of the motor. The reduction between the driving member 1 and the unlettered gear in the German patent is shown as being 3½ to 1. The extent of the reduction in the reduction gear c is not shown, but, even if it be only 2 to 1, the total reduction between the motor and the driving member would be 7 to 1. There-

fore the starting motor will turn a full revolution for only one-seventh of a revolution of the driving member. Thus, even though only a small revolution of the driving member brings it into driving relationship, the starting motor will have a large movement approaching the one-turn movement of free rotation of the Kennington device.

The specification of this German patent contains no statement of what the speed of the motor will be at the time of the establishment of the driving relation, nor does the specification of the Kennington patent. That the motor in the patent in suit is running other than slowly at the time the driving relation is established can only be inferred from the statement in the Kennington specification that the spring absorbs the shock, but in the German patent it is stated that the springs are applied for the same purpose.

The yielding driving connection in the engine starter disclosed in the German patent thus acts to utilize the deceleration torque, due to the kinetic energy of rotation which is necessarily built up in this structure, during the period prior to the establishment of the driving relation. The same type of yielding driving connection is shown in the patent to Brace, 1,220,492, and the Bendix patents 1,299,418 and 1,299,419.

All of the structural elements of the claims 10, 11, and 12 of the patent in suit are present in the German patent, and they operate in the same way to perform the same function.

As the German patent to Vogtland was not cited as a reference in the Patent Office, the granting of the patent in suit did not create a presumption of validity of the claims in suit over that German patent.

There is no force to plaintiff's suggestion of nonanalogous art, as what we are dealing with is not printing presses, but with the starter, and the problem is the same whether the motor to be started drives a printing press, an automobile, or an airplane propeller.

Plaintiff's suggestion that the deceleration torque which is necessarily and inherently present in the German patent is "incidental, unappreciated and unnecessary" is without force, as "incidental and unappreciated" apply as well to the Kennington patent as to the Vogtland patent, and plaintiff's suggestion that the deceleration torque developed by the Vogtland starter is

unnecessary to its operation is not supported. It is just as necessary, if not more necessary, in the Vogtland starter than it is in the Kennington starter.

Plaintiff's assertion that the Vogtland patent does not disclose a "running start" or "fast starting" is not supported by the evidence, as the starting motor in Vogtland has a considerable period of acceleration prior to the coupling of the starting motor with the main driving motor.

The Vogtland German patent is a complete anticipation of the claims in suit of the Kennington patent in suit.

The claims in suit are very broad, and I am convinced that they apply to the starter of the Bijur patent 1,095,696.

That being so, I see no invention in the addition of a spring in an automatic mesh and demesh starter to reduce the shock occurring during its operation. The Kennington device cannot be differentiated from the Bijur patent on the ground that one utilized deceleration torque and the other does not. Bendix, Bijur, and Kennington, acting independently in developing the automatic mesh and demesh type starter, all included the spring in the train of gearing, and, as Bendix and Bijur were prior to Kennington, the use of the spring appears to have been obvious. There is no evidence that a long-existing problem was solved by the addition of the spring; on the contrary, it was an old and common expedient in the art to introduce a spring in the train of gearing to reduce shock.

There was no invention by Kennington in adding the spring to Bijur.

The Eclipse Bendix drive did enjoy great commercial success, but that success was the result of the work of Bendix and not of Kennington.

Kennington was in no sense a pioneer, but simply a follower.

The claims in suit of the Kennington patent in suit are invalid.

A decree may be entered in favor of the defendant against the plaintiff, dismissing the bill of complaint on the merits with costs.

Settle decree on notice.

Submit proposed findings of fact and conclusions of law in accordance with this opinion for the assistance of the court, as provided by rule 70½ of the Equity Rules (28 U.S.C.A. following section 723) and rule 11 of the Equity Rules of this court.