## HARPER v. ZIMMERMANN.
### No. 698.

District Court, D. Delaware.
May 7, 1930.

Leonard E. Wales, U. S. Atty., of Wilmington, Del., and John W. Loveland, Asst. to Atty. Gen., for plaintiff, Brown, and the United States.

Josiah Marvel, of Wilmington, Del., and W. P. Preble, of New York City, for defendant.

MORRIS, District Judge.

On November 22, 1921, Paul G. Zimmermann filed an application for a patent on "Airplane Wings and Art of Mechanical Flight." On April 3, 1922, Carl Brown Harper filed an application for a patent on "Airplanes." Thereafter, on May 16, 1924, the Patent Office declared an interference between the copending applications upon three counts. The Examiner of Interferences decided in favor of Zimmermann. The Board of Appeals confirmed, June 23, 1928, the decision of the Examiner. Thereupon Harper filed this suit in equity under R. S. § 4915, as amended (35 USCA § 63), praying that he be adjudged entitled to receive a patent for the invention defined in the counts in issue. Zimmermann filed his answer and later the United States, to which Harper had granted a nonexclusive license, intervened as a party plaintiff.

At the trial no evidence was presented by or on behalf of Zimmermann. He here relies upon his application date, the decision of the Patent Office in his favor, and upon patent No. 1,697,674, issued to him as a consequence of that decision. Harper, however, asserts that he (Harper) was the first to conceive and disclose the invention of the counts in issue; that he reduced the invention to practice prior to Zimmermann's filing date; that, even if his acts prior to Zimmermann's filing date did not constitute an actual reduction to practice, he used reasonable diligence in adapting and perfecting the invention; and that, in either event, he is entitled upon the issue of priority to an earlier date than Zimmermann.

The invention constituting the subject-matter of the interference and of this suit

is an improvement in airplane wings growing out of the fact or principle that thin, flat-surfaced wings have low lifting power but are essential for high speed, while wings having upper surfaces of high camber or curvature are conducive to high lift but low speed. The first consequence, probably, of the discovery of this principle was the conception or realization that a wing whose curvature or camber could be changed by the pilot during flight would permit the use of the high camber when needed in getting off the ground and in alighting and the use of the low camber or relatively flat wing surface during the flight proper. This thought, however, antedated both Harper and Zimmermann. Before they entered the art, it had been proposed to bend the whole wing from front to rear, but this required a flexible structure that was deemed unsafe. Patent to Holle, No. 1,225,711, granted May 8, 1917, disclosed aerofoils "constructed with a flexible rear or trailing edge and a rigid front or entering edge, said front edge having a continuous undeformable under surface and a continuous deformable upper surface so that the camber of said upper surface can be varied." The starting point of Harper and Zimmermann was in effect the Holle structure. The upper surface of the Holle wing, though flexible, was continuous and unbroken. The improvement of Harper and Zimmermann divides that part of the wing into segments and provides pivoted or hinged connections between the segments. Each of the three counts defining the invention is limited to this improvement. Count 1 calls for "adjustable ribs pivoted at their front and rear ends and determining the shape of the upper side." Count 2 is limited to having the upper section "hinged at the leading edge" and "hinged at the rear region." Count 3 has the same limitations as count 2. The segments are raised and lowered as desired by the pilot by means of toggles.

Harper states that his conception of this invention was had in 1917 while he was a student at the Massachusetts Institute of Technology; that he then made a sketch of his idea in a notebook, exhibited the sketch to his fellow students, Aldrin and Brown, and explained to them its objects and purposes. The notebook has been lost, but at the trial Harper, Aldrin, and Brown each reproduced the sketch from memory. Aldrin and Brown each testified that he understood from Harper's sketch and statement how the construction was to be made and operated.

Brown further testified that from the sketch and information disclosed to him by Harper he (Brown), as a practical engineer, could have made and operated a wing embodying all the counts in issue, without further help from Harper and without the exercise of inventive skill.

But early in January, 1918, Harper enlisted in the United States Navy. He was directed to remain for two or three months at the Massachusetts Institute of Technology to complete his engineering course. In April, 1918, he was ordered to the Aviation Section of the Bureau of Construction and Repair of the Navy Department at Washington and was assigned to engineering problems having to do with the production of aircraft. He there spent five years on duty in connection with the design, construction, and testing of aircraft and their accessories. During that time he became the head of the Engineering Section of the Aircraft Division. Yet, during the war he was inhibited by his commanding officer from proceeding with the development or actual reduction to practice of his conception. This inhibition was removed about July, 1920, but during that month Harper's back was broken in an airplane crash and for a long time thereafter he was entirely incapacitated. While Harper was so incapacitated, he explained his variable camber wing idea to Stetler, a draftsman of the Navy Department, and delivered to him one or more sketches roughly illustrating his conception. From the information so obtained, Stetler prepared in August, 1920, a full-sized, cross section drawing, Exhibit 17, of a wing embodying all the features disclosed to him by Harper.

This drawing was delivered to Lybrand, another Navy Department draftsman, who prepared from it complete full-sized working drawings, Exhibits 18A-L, for the purpose of building a full-sized plane. Subsequently, the drawings for the Patent Office application were made from these working drawings. They embodied every detailed feature and element of the counts in issue and are admitted by the defendant to show the invention of those counts. With respect to them, the only question is as to the time of their completion.

From these drawings, Exhibits 18A-L, Lybrand later made other drawings, Exhibits 19–21, for the purpose of making a model embodying the invention to be sand load tested. These drawings likewise disclosed the invention, but here, too, the question is

whether they were made before or after the date of Zimmermann's application. The machine constructed in accordance with them was completed and delivered to the Bureau of Aeronautics of the Navy on March 22, 1922, and was successfully subjected to the wind tunnel tests on March 25, 1922, and later.

The conclusion of the Examiner of Interferences was based upon a finding that Harper's reproduction of the sketch made in his notebook in 1917, the Stetler drawing, Exhibit 17, and certain other rough drawings introduced in evidence before the Examiner, did not disclose a conception of the invention, in that, as the Examiner found, such drawings did not disclose an outer wing surface having pivoted or hinged sections and upon the further finding that the Lybrand drawings, Exhibits 18A-L and 19-21, were not completed prior to Zimmermann's filing date. The affirmance of the decision of the Examiner of Interferences by the Board of Appeals was predicated upon the same subordinate findings.

The decision of the Board of Appeals is not conclusive of priority, and the doctrines of res judicata and estoppel are without application to a subsequent suit under R. S. § 4915, as amended (35 USCA § 63). A suit under this section is an original independent action in which the questions in issue are tried de novo upon all competent evidence new and old. Victor Talk. M. Co. v. Brunswick-Balke-Collender Co. (D. C.) 290 F. 565, 569, 570. In the case at bar the record in the Patent Office proceeding was introduced in evidence not, however, to establish the facts therein testified to, but solely for the purpose of showing what was before the Patent Office tribunals. The evidence here adduced includes substantial evidence that was not before the Patent Office. But such evidence is not of the character condemned in Barrett Co. v. Koppers Co. (C. C. A.) 22 F.(2d) 395. Harper here contends, not only that the evidence before the Patent Office tribunals was adequate to establish that the notebook sketch of 1917, the Stetler drawing of 1920, and the subsequent Lybrand drawings all embodied all the elements of the counts in issue and that they were all completed before Zimmermann's filing date, but also that the additional new evidence here presented has removed both these questions from the realm of reasonable controversy.

The notebook sketch of 1917 was but a rough drawing. The reproductions of that lost sketch were made from memory and the oral testimony with respect thereto was given after the lapse of many years. While I do not question the belief of Harper, Aldrin, or Brown with respect to the accuracy of their recollection, I must not ignore the well-established fact that, other things being equal, memory fades with the lapse of time. The picture drawn from memory after the lapse of years is frequently colored all unconsciously by present knowledge. It is difficult to winnow with accuracy the early information from the later. Moreover, it is unnecessary in the case at bar to base the decision upon unaided memory, for, if the Stetler drawing, Exhibit 17, does not disclose the invention, it would be difficult to believe that the notebook sketch of 1917 disclosed it. If the Stetler drawing does disclose the invention, it is unprofitable to speculate upon the probabilities of the accuracy or inaccuracy of unaided memory.

The evidence is clear that the Stetler drawing, Exhibit 17, was made in August, 1920, and in accordance with Harper's instructions. The sole question with respect to it is whether it discloses an upper surface having pivoted or hinged sections. Neither the Examiner of Interferences nor the Board of Appeals was able to say from the evidence adduced before them that it had. The testimony here given by Harper, Stetler, Lybrand, and Beisel, however, removes all doubt with respect to that issue. They are in complete accord that to one skilled in the art, the drawing does disclose a wing having an upper surface with pivoted or hinged sections. And there is no evidence to the contrary. Indeed, it seems to me that the drawing itself makes disclosures that are impossible to reconcile with any other conclusion. The ribs are of such dimensions that it would be otherwise practically impossible to flex or bend them from the low to the high camber position and vice versa. Again, the extent of the arc through which the part of the rib between the leading edge and the first toggle passes when the upper surface of the wing is changed from low camber to high camber makes it clear, I think, that a hinge at the leading edge is obviously indispensable. Consequently, it is reasonably clear that the symbol at that point is for a hinge. The same symbol, however, is used at different points of the rib. The reasonable presumption is that the same symbol was not employed to represent different structures or devices. Still again the rib structure at and near the end of each toggle is the same as

near the hinge at the leading edge. I see no escape from the conclusion that the Stetler drawing made in August of 1920 fully discloses the conception of the invention of the counts in issue.

But Harper did not stop with the Stetler drawing. From it full-sized working drawings, Exhibits 18A–L, admittedly disclosing the invention in issue, were prepared by Lybrand. These drawings were referred to W. A. Mankey for computation of weights. He kept a notebook of his work. This notebook has been discovered since the termination of the interferences in the Patent Office and was here presented as new evidence. It contains an entry showing that Mankey had the drawings, Exhibits 18A–L, in his possession on September 21, 1921, two months before Zimmermann's filing date. This is corroborated by other evidence. There can be no doubt that these drawings, too, were completed before Zimmermann filed his patent application.

The later Lybrand drawings, Exhibits 19–21, for a model embodying the invention to be sand load tested for the purpose of determining the aeronautic characteristics of the Harper structure, how many hinge section connections were desirable to give the best results, and whether the manipulation of the sections by a pilot during flight would be practical, bear a stamped filing date of December 6, 1921. But a letter bearing the signature of Admiral Moffett, accompanied by these drawings, was sent to the Navy Yard requesting the construction of the model machine in accordance with these drawings. This letter is dated November 22, 1921. The completion of these drawings prior to that date is further supported by the witnesses Fulton, Hunsaker, whose initials appear on the route sheet referring to the letter, and Lybrand, who made the drawings and took them to the Navy Yard. Upon the record here made there is no room for doubt that all the drawings in evidence were completed before November 22, 1921.

The model constructed in accordance with the drawings, Exhibits 19–21, was completed and delivered to the Bureau of Aeronautics of the Navy on March 22, 1922, and was successfully tested on March 25, 1922, and later. The tests were successful, and on April 3, 1922, shortly after their conclusion, Harper filed his application for a patent.

██ Do these facts show that Harper is entitled to an earlier date than Zimmermann? Although it is well settled that every invention contains two elements—a mental and a physical one, an idea conceived by the inventor and an application of that idea to the production of a practical result—Robinson on Patents, § 77, and that, consequently, an invention does not exist until the generated idea has been reduced to practice, Robinson on Patents, § 125; Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 489, 11 S. Ct. 846, 35 L. Ed. 521, yet it is equally settled that for certain purposes the law takes notice of the existence of the idea apart from its reduction to physical form. Robinson on Patents, § 132. As between rival inventors for an allowed invention it regards the first conceiver, if he used reasonable diligence in perfecting his invention and reducing it to practice, as the first inventor, notwithstanding the invention was first reduced to practice by another. Automatic Weighing Mach. Co. v. Pneumatic Scale Corp., 166 F. 288 (C. C. A. 1); Curtiss Aeroplane & Motor Corporation v. Janin, 278 F. 454, 457 (C. C. A. 2); Christie v. Seybold, 55 F. 69, 76 (C. C. A. 6); McCormick Harvesting Mach. Co. v. Minneapolis Harvester Works (C. C.) 42 F. 152, 155. This attitude of the law is probably based upon R. S. § 4920 (35 USCA § 69), which permits a defendant in an action upon a patent to set up that plaintiff had "surreptitiously or unjustly obtained the [his] patent for that which was in fact invented by another, who was using reasonable diligence in adapting and perfecting the same." Automatic Weighing Mach. Co. v. Pneumatic Scale Corp., 166 F. 288 (C. C. A. 1).

██ But the law will not accept the mere unsupported word of the alleged inventor as sufficient proof of prior conception. Armstrong v. De Forest Radio Telephone & Tel. Co., 280 F. 584 (C. C. A. 2); Eck v. Kutz (C. C.) 132 F. 758. To allow inventions to date from mental conceptions wholly unrecorded and having no existence outside the mind of the inventor would not only "strongly tempt inventors to commit perjury in order to appear to anticipate real anticipations of their" inventions, Walker on Patents (6th Ed.) § 109, but would, as well, give value to conceptions that had not been reduced to a state in which they could possibly be of service to mankind. Hence evidence of conception must include corroboration such as a disclosure to others, or a record, or embodiment of the invention in some clearly perceptible form. But any adequate and accurate description of the invention either in words, or drawings, or by model will suffice. The law requires only that the disclosure, drawings,

description, or model relied on to establish conception of the invention must show a conception sufficiently complete to enable one skilled in the art to reduce the conception to practice without exercise of inventive skill. Armstrong v. De Forest Radio Telephone & Tel. Co. (C. C. A.) 280 F. 584. The date of the disclosure, drawing, description, or model fixes the date of conception as recognized by the law. Philadelphia & Trenton Railroad Co. v. Stimpson, 14 Pet. 448, 462, 10 L. Ed. 535; Corrington v. Westinghouse Air Brake Co., 178 F. 711 (C. C. A. 2).

Harper, however, here contends that as the filing of a patent application is a constructive reduction to practice, Republic Iron & Steel Co. v. Youngstown S. & T. Co., 272 F. 386 (C. C. A. 6); Willard v. Union Tool Co., 253 F. 48 (C. C. A. 9), drawings enabling one skilled in the art to reduce the invention to practice without exercise of inventive skill are likewise a constructive reduction to practice; and that as an inventor who is the first to conceive an invention and also the first to reduce it to practice is entitled to be considered the first inventor, without regard to his diligence, even though a subsequent conceiver may anticipate him in applying for or obtaining a patent, Laas v. Scott (C. C.) 161 F. 122, the finding that the Stetler and the Lybrand drawings, Exhibits 17–21, were full and complete disclosures of the Harper invention and that they were completed prior to Zimmermann's filing date constitutes a finding of priority in favor of Harper without regard to his diligence.

The soundness of this contention depends upon whether or not an unpublished drawing fully and clearly setting out an invention may be considered a reduction to practice of the invention. The affirmative side of this question has some apparent authoritative support. Macomber, in his "Fixed Law on Patents," says: "Diligence is of importance when the question of priority, the question of competition for the right, arises. As to what constitutes reduction to practice, it is clear when we compare the earlier decisions, such as Seymour v. Osborne, 11 Wall. (78 U. S.) 516, 20 L. Ed. 33, * * * with the Telephone Cases, 126 U. S. 1, 8 S. Ct. 778, 31 L. Ed. 863, * * * that the rule has changed materially; and still later, in The Barbed Wire Patent, 143 U. S. 275, 12 S. Ct. 443, 36 L. Ed. 154, * * * we reach the final test, the 'last step rule.' It is evident that a literal following of the earlier rule, the actual construction in material form, would render void many patents. It would

have defeated Bell's patent, very likely. The time when an invention must be reduced to practice by putting the idea into wood and iron is past. In the early days that course was largely necessary, just as the filing of a model was often necessary to the understanding of an invention. Clearly, then, it may be said that reduction to practice is no longer a matter of construction, building, trial, but the disclosure of the idea by any means—device, drawing, or verbal description—which will enable one skilled in the art to make and use the same. This test may render a sketch sufficient; it may render an experimental machine insufficient; for if the idea of means, operative means, is disclosed, there is invention; and any number of models or experimental machines—such as there were in the Telephone Case and in the Barbed Wire Case—if they fail to disclose the idea so that another may practice the alleged invention, cannot lay the foundation for a patent. But where there is conflict and contest for priority, finer distinctions must be made and other tests resorted to." Page 68.

At section 867, Macomber adds: "Expression of the means of an alleged invention, in a drawing or sketch, is frequently the best attainable evidence of the needful 'representation in physical form,' and may rightly be accepted as satisfactory proof of such fact, when fairly authenticated, definite, and reasonable under the circumstances." Curtiss Aeroplane & Motor Corp. v. Janin, 278 F. 454, 456 (C. C. A. 2), lends support to this view. It says: "Reduction to practice is not merely a matter of construction, building and trial, but may consist in the disclosure of the idea by any kind of description, pictorial, verbal, or written, which will enable one skilled in the art to make and use that which is disclosed. We think a drawing may possibly be a sufficient reduction to practice, and an experimental machine insufficient, for the question is one of degree, and the ultimate test is always whether the inventor has shown operative means to that theoretically omnipresent person, the man skilled in the art." United States Code Annotated, Title 35, p. 183, states in a note to section 31 (R. S. § 4886), that, "A drawing or a model is sufficient to constitute a reduction to practice to determine the question of priority," and that, "To be the first inventor, it is not necessary that he who first conceived the idea should first reduce it to practice in any other sense than to so describe it on paper, with such drawings or model as to enable any person skilled in the art to make and use the

same." Webster Loom Co. v. Higgins, 105 U. S. 580, 594, 26 L. Ed. 1177, which said, "An invention relating to machinery may be exhibited either in a drawing or in a model, so as to lay the foundation of a claim to priority, if it be sufficiently plain to enable those skilled in the art to understand it," and Milburn Co. v. Davis, etc., Co., 270 U. S. 390, 46 S. Ct. 324, 70 L. Ed. 651, are deemed by the plaintiff here to be additional authorities in support of his view that an unpublished drawing fully exhibiting the invention is a reduction to practice.

But the support afforded to plaintiff's view by these authorities is more apparent than real. The statement by Mr. Justice Bradley in Webster Loom Co. v. Higgins, that a drawing may "lay the foundation of a claim to priority," is, I venture to think, nothing more than a recognition of the principle that priority of conception followed by diligence in reduction to practice establishes priority of invention and that prior conception may be evinced by a drawing though it may not be by the unsupported statement of the inventor. None of the authorities relied upon has given to an unpublished drawing the effect of a reduction to practice. Indeed, save in the use of the term "reduction to practice," they seem to go no further than to hold that an inventor who has filed an allowable application for a patent, and thereby made a constructive reduction to practice of his invention, need not, upon the issue of priority, establish that he has theretofore made an actual reduction to practice if he is able to show by adequate drawing, or the like, a conception date earlier than that of his rival. Coupled with the requirement of reasonable diligence this, of course, is a correct statement of the settled law.

If, perchance, the authorities relied upon do rule that an unpublished drawing fully disclosing the invention is as much a constructive reduction to practice as is the filing of an allowable application for a patent and eliminates the necessity for showing diligence in actually making the machine or device or in applying for a patent, it seems to me they run counter to the principles, policy, and provision of the patent laws and the vast preponderance of authority, for the purpose of granting a patent to an inventor is to induce disclosure. Gayler v. Wilder, 10 How. 477, 13 L. Ed. 504. The benefit to the public by the disclosure of inventions is the primary consideration for the grant of patents. Kendall v. Winsor, 21 How. 322, 16 L. Ed. 165; Grant v. Raymond, 6 Pet. 218,

8 L. Ed. 376. The interests of the public in the granting of patents are even paramount to those of inventors. The principal enactment relating to utility patents is Rev. St. § 4886, as amended March 3, 1897 (35 USCA § 31). It makes no provision for and so invalidates a patent for an invention "known or used by others in this country." But mere acquaintance with the invention, even if disclosed, is not, within the meaning of this section, prior knowledge of a character that will defeat a patent; nothing short of a reduction to practice will do. Block v. Nathan Anklet Support Co., 9 F.(2d) 311, 312 (C. C. A. 2); Clark Thread Co. v. Willimantic Linen Co., 140 U. S. 481, 11 S. Ct. 846, 35 L. Ed. 521. Nor is novelty of a machine or manufacture negatived by any prior unpublished drawings, no matter how completely they may exhibit the patented invention. Ellithorp v. Robertson, Fed. Cas. No. 4408; Detroit Lubricator Mfg. Co. v. Renchard (C. C.) 9 F. 293, 297; Odell v. Stout (C. C.) 22 F. 159, 164, 165; Pennsylvania Diamond-Drill Co. v. Simpson (C. C.) 29 F. 288, 291. See Bates v. Coe, 98 U. S. 31, 33, 34, 25 L. Ed. 68; Walker on Patents (6th Ed.) § 109. Private unpublished drawings may be mislaid or hidden so as to preclude all probability of the public ever deriving any benefit therefrom, and the policy and language of the law combine to forbid that that from which the public may derive no benefit shall serve to defeat a patent for which the public has received, as a consideration, full disclosure. Walker on Patents (6th Ed.) § 100. It would be difficult to understand how a drawing which lacks power to anticipate could nevertheless possess power in and of itself to establish priority in an interference. But the law gives rise to no such anomaly, for it is but little short of uniform in holding that an invention is not reduced to practice by the mere making of sketches or drawings, no matter how clearly and completely they may disclose the invention. Scherzer Rolling Lift Bridge Co. v. City of Chicago (D. C.) 2 F.(2d) 601; Minneapolis, St. P. & S. S. M. Ry. Co. v. Barnett & Rec. Co., 257 F. 302, 311, 312 (C. C. A. 8); McCreery Engineering Co. v. Massachusetts Fan Co., 195 F. 498 (C. C. A. 1); Automatic Weighing Mach. Co. v. Pneumatic Scale Corp., 166 F. 288 (C. C. A. 1); Christie v. Seybold, 55 F. 69, 77 (C. C. A. 6); Pennsylvania Diamond-Drill Co. v. Simpson (C. C.) 29 F. 288, 290, 291; Detroit Lubricator Mfg. Co. v. Renchard (C. C.) 9 F. 293, 297; Robinson on Patents, § 126; 48 C. J. 117, note 2.

██ Since the drawings, Exhibits 17–21, have no effect other than to establish prior conception by Harper, he is not entitled to priority over Zimmermann unless he has connected his conception with reduction to practice by reasonable diligence. R. S. § 4920 (35 USCA § 69); Martin v. Curtiss Aeroplane & Motor Co. (D. C.) 26 F.(2d) 701; Twentieth Century Machinery Co. v. Loew Mfg. Co., 243 F. 373, 384 (C. C. A. 6); Automatic Weighing Mach. Co. v. Pneumatic Scale Corp. (C. C. A.) 166 F. 288; 48 C. J. 115, note 65. The diligence required is, however, not comparative diligence between the parties, or a "race of diligence," as it is sometimes called. Robinson on Patents, § 384; Twentieth Century Machinery Co. v. Loew Mfg. Co. (C. C. A.) 243 F. 373, 384; Walker on Patents (6th Ed.) § 135. Knowledge of the entry of the rival in the field is not necessary in order to impose the duty of diligence. The policy of the patent law does that in the public interest. Effective diligence must commence upon conception—before the rival inventor enters the field—and must continue thereafter. Christie v. Seybold, 55 F. 69 (C. C. A. 6). Whether an inventor has used reasonable diligence is to be determined, not by any arbitrary rule, but in the light of all the circumstances of the particular case. The law does not require that the inventor give all his time to the development of the invention or abandon his usual occupation or means of livelihood. Joy v. Morgan, 54 App. D. C. 110, 295 F. 931, 935; Robinson on Patents, § 387. It allows a reasonable time for experiments. Moreover, forbearance to apply for a patent until after the completion of such experiments and tests does not afford a just ground for a finding of want of diligence. Agawam Co. v. Jordan, 7 Wall. 583, 607, 608, 19 L. Ed. 177; Joy v. Morgan, supra; Walker on Patents (6th Ed.) § 135.

██ Since Zimmermann adduced no evidence to take his date of conception back of his filing date, that date, November 22, 1921, must be deemed to be his date of conception, too. The Stetler drawing fully disclosing the invention by Harper was completed in August, 1920. That fixes the date of Harper's conception. His duty to exercise reasonable diligence began then. He immediately proceeded diligently to make working drawings, then a wing to be tested. Promptly upon the completion of the successful tests, he filed his patent application. I think he has met all the requirements of the law, and that he is entitled to the decree he seeks.