**BARKEIJ v. FORD MOTOR CO.**
No. 1022–M.

District Court, S. D. California, Central Division.
April 12, 1938.

Alan Franklin, of Los Angeles, Cal., for plaintiff.

Lyon & Lyon (by Leonard S. Lyon), of Los Angeles, Cal., Frank Parker Davis, of Chicago, Ill., I. Joseph Farley, of Detroit, Mich., and Harry W. Lindsey, Jr., of Chicago, Ill., for defendant.

McCORMICK, District Judge.

Complainant sues the defendant company in equity for the infringement of patent No. 2,012,902, granted August 27, 1935, to J. A. H. Barkeij, upon his patent application filed July 18, 1934. The grant is for method and means of gas distribution in inlet manifolds for internal combustion engines. The plaintiff asks for an injunction against defendant company and for an accounting of profits.

The patentee states the objects of his disclosures in the following manner:

"My invention relates more particularly to distribution of a fuel-air mixture to the cylinders of a V type motor, having two rows of cylinders at an angle, or a multiple of two rows.

"The present application is a continuation in part of my application Ser. No. 101,715 of April 13, 1926, especially for the figures on the first and second sheet of drawings. Those on the third sheet, Fig. 5 and 6 are new. It is at the same time a continuation in part of my application No. 632,006 of Sept. 7, 1932, and of my application No. 702,970, of Dec. 18, 1933.

"The sequence of the suction periods, which are substantially greater than 180° but not greater than 255° depends upon the arrangement of the crank pins and the angle of the cylinder rows.

"The first object of my invention is to arrange the fuel-mixing means centrally between the two cylinder blocks, and to arrange the primary branches extending from the inlet passage or riser (R) connected to said fuel-mixing means longitudinally with respect to the longitudinal axis of the engine, which axis is parallel to the axis of the crankshaft thereof.

"My second object is to arrange the manifolding and the sequence of the suction order, compatible with the arrangement of crankpins and angle of the cylinders, so that no two immediately consecutive suctions occur in the same direction in the same primary branch of the manifolding.

"My third object is to arrange dual or double manifolding, which incorporates at the same time the said first and second object.

"Other objects will appear hereafter during the discussion of the various figures and objects."

The claims of the patent in suit of which complainant avers infringement by the inlet manifold of the V8 engines of Ford motor vehicles manufactured, used and sold during the years 1934, 1935, 1936, and 1937, are claims 3, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21, 22, 23, 24, and 27.

The defendant company urges two general defenses: (1) Invalidity of the patent;- and (2) noninfringement.

The first general defense is amplified by proper pleading by defendant of several special matters that are made available in resisting actions for infringement under section 4920 of the Revised Statutes, as amended, 35 U.S.C.A. § 69.

Among these, in addition to anticipation by certain cited American and foreign patents and printed publications, are the contentions: (a) That Barkeij was not the original or first inventor of the method and means disclosed and claimed in the patent, but that to the contrary the substance of the invention claimed therein was known, produced, and practiced by the defendant corporation and by Cadillac Motor Car Company, a corporation, and by Joseph W. Ridgeway and by David E. Anderson, both of Detroit, Michigan, prior to the date of the invention claimed by Barkeij; (b) that all the substantial and material parts of the alleged invention embodied in the patent were in public use and on sale in the United States by the same corporations and persons named in (a) hereof more than two years prior to the application for the patent in suit.

One of the problems that confronted the automobile industry in satisfactory commercial production of eight-cylinder motorcars was to so arrange and control fuel distribution in the intake manifolding that maximum power could be equalized, conserved, and utilized in the operation of the motor vehicle. This problem of efficient fuel distribution was relatively simple in motor cars of fewer cylinders. In such construction a single unitary carburetor and solely one intake manifold satisfactorily serves each and all of the cylinders. There is no overlapping in the suction phases of the cylinders during the revolution of the motor through the action of the crankshaft such as is encountered in V8 engines.

The pioneer in solving the problem referred to is shown by the record before us to have been a French inventor, De-launay-Belleville, to whose assignee, on October 21, 1909, there was issued a British patent No. 28,379, for "Improvements in and relating to Multiple-cylinder Explosion Motors," and who himself, on March 9, 1909, filed an application, Serial No. 482,268, in the United States Patent Office, for "Multiple-cylinder Explosion Motor," and to' whom, upon such application, a patent, No. 1,051,866, was granted February 4, 1913.

The invention disclosed, embodied, and claimed in these British and American patents is the basis of all experiments, work, and accomplishments which have resulted in the manufacture, production, and use of the accused manifold that is a part of the 1934 and subsequent yearly models of the Ford V8 automobile. The teachings of these early patents apply generally to multiple-cylinder explosion motors.. It is true that to illustrate his invention Delaunay-Belleville showed in the drawings of both patents a straight six-cylinder engine and a radial seven-cylinder engine, but in the British patent the specifications in part read: "The application of the present invention is the same for two or four cycle motors irrespective of the number of cylinders of the motor and their relative arrangement, such as parallel cylinders, *inclined cylinders,* etc., the novel arrangement consisting in feeding with fuel by means of a carburetter a series of cylinders selected in such a manner that in this series the suction never occurs simultaneously in two or more of the cylinders of which the series is composed." (Italics supplied.)

We clearly find from these early references that the manifolding of multi-cylinder engines revealed to engineers, skilled mechanics and to the art generally that unequal gas distribution resulted from two cylinders drawing fuel simultaneously from one and the same manifold passageway.

The informative matter is succinctly presented by Delaunay-Belleville thus: "In a multiple-cylinder explosion motor with a single carburetor when the suctions of two cylinders take place simultaneously during a fraction of a revolution, trouble arises in the flowing of the gases, the suction of one of the cylinders opposing the suction of the other during the period at which suction takes place simultaneously and the result of this is to reduce the efficiency of one or other of these cylinders

or of both of them. The suction of a cylinder lasts practically during a stroke, that is to say while the motor effects a half-revolution, so that two suction periods are simultaneous when the angular interval between the commencements of these two suction phases is less than 180°."

The trouble adverted to in the quoted part of the patents was overcome by feeding the fuel through an arrangement of separate carburetors in combination with independent and different passageways of the manifold operating to cylinders grouped and designed in a way that would avoid the simultaneous suction of two cylinders during a fraction of the revolution of the motor. It is by the application of the thus imparted principle of operations that the defendant has constructed and fashioned the intake manifolds upon its V8 engines, and it is clear from the record that with Delaunay-Belleville's teaching only skillful foundry designing problems were necessary to attain best results and those found in the alleged infringing instrumentalities.

The French inventor specified the method and means as follows:

"It consists in feeding fuel to the motor by means of two or more separate carbureters, each of them feeding a certain number of cylinders by means of independent piping, these cylinders being selected in such a manner that the suction periods of any two of these cylinders are not simultaneous or even partially and consequently the explosions of these cylinders succeed each other at angular intervals of at least 180°. Of course it is to be understood that I use the minimum number of carbureters which will realize the aforesaid conditions.

"In the accompanying drawing:—Figures 1 and 2 are diagrammatic views showing one arrangement of carbureters in accordance with the invention, Fig. 1 being a view from the side and Fig. 2 an end view, Fig. 3 is a diagrammatic view of a modification wherein the cylinders are arranged radially instead of side by side, Figs. 4, 5 and 6 are a longitudinal section, a side elevation and a top plan view, respectively, of the connection between the valves of the carbureter ducts, Figs. 7, 8 and 9 are a vertical section, side elevation, and a top plan view, respectively, of a modified form of connection between said valves, Figs. 10, 11 and 12 are a vertical section, side elevation, a top plan view,

respectively, of a further modified connection with the valves of the carbureter ducts, and Figs. 13, 14 and 15 are a side elevation, vertical section, and top plan view respectively, of a still further modification of the arrangement shown in Figs. 4 to 6.

"The engine illustrated in Figs. 1 and 2, by way of example, is a four-cycle motor with six vertical cylinders, the cranks of which are distributed at angular intervals of 120°. The cylinders are numbered in the order of their successive explosions (and not in accordance with their arrangement on the motor) and are designated 1, 2, 3, 4, 5, 6. In the case of a single carbureter, the explosion 2 is separated from the explosion 1 which precedes it and from the explosion 3 which follows it by an angular interval of 120°; the suction phases are therefore simultaneous during a period of 60° as regards the cylinders 2 and 1 and also as regards the cylinders 2 and 3; that is to say the suction stroke of the cylinder 2 is affected by the trouble due to the fact that the suctions take place simultaneously during the first and last thirds of its development. The same applies to each of the other cylinders of the motor. If, on the other hand, as in the case represented in Figs. 1 and 2, the cylinders 1, 3, 5 are fed by a carbureter A and the cylinders 2, 4, 6 by another carbureter B, the two suction pipes being entirely independent, it follows that in each of these two groups the angular interval that separates the explosion of any one cylinder from the explosion that follows it, will be 120° x 2 = 240°. The suction periods thus remain entirely separate insuring the uniformity of carburization, the equal dynamic effect of the charges of the several cylinders and in short the efficient operation of the motor. With a motor comprising a different number of cylinders, the number of independent carbureters to be employed will be determined by the same condition, that is to say the suction periods of two cylinders grouped on one and the same carbureter follow each other at an angular interval equal to or greater than 180°. * * *

"The number of carbureters to be employed and the grouping of the cylinders served by each carbureter, will readily be settled by analyzing the data in each case. Obviously the number of carbureters employed is the minimum number which will accomplish the above result."

We think it is clear that dual intake manifolding systems applied to multiple-cylinder internal combustion engines are sufficiently disclosed and claimed in these two early British and American patents to Delaunay-Belleville to circumscribe and limit the claims of patents subsequently granted upon the subject matter of gas distribution in dual intake manifolds in such engines. In other words, the two patents should be and are classified as pioneer and generic inventions in the intake manifolding art under consideration in this action.

There is in these early references no express specification or graphic illustration of the two manifolds lengthwise and midway the two cylinder groups on the V-type engine, or the down-draft carburetor, which are shown and claimed by Barkeij and by Figures 2(b), 3, 4, 5, and 6 of his patent, but some of these differentiating features are purely structural detail and all of them are disclosed in patents or structures earlier than any pertinent invention of Barkeij, or have been shown by the evidence to have been made and publicly used in the course of production and commerce long prior to any date of conception or reduction to practice of any applicable inventive feature of the patent in suit. In relation to any inventive feature that Barkeij states to be an object of his discovery in the subject matter of dual intake manifolding of internal combustion engines, we think, as did the patent examiner under date of February 14, 1933, in considering Barkeij's application of September 7, 1932, that: "The form of the crankshaft and firing order used constitutes matters of mere choice, since only a mathematical process is necessary, not involving invention." And we also believe that the correlative sequence of the suction order of the cylinders is likewise determined by mathematical principles and known laws of physics, and also does not indicate invention. In fact, Barkeij, on September 7, 1932, in his application, Serial No. 632,006, stated that "My invention relates more particularly to the distribution of a fuel-air mixture in engines of the V type, having two rows of cylinders at an angle, or a multiple thereof. The suction intervals and the sequence of the suctions in the various cylinders of such engines depend upon the arrangements of the crankpins connected to the pistons in said cylinders, and upon the cylinder angle."

It is further noteworthy in relation to the conclusion just stated that complainant in Paper 68 of the File Wrapper and Contents of his abandoned first application of April 13, 1926, No. 101,715, stated: "Claim 33-36 maintain that the suction order is an unseparable thing for a manifold, and claims therefore the whole engine with a certain cycle of operation which is unseparable from the engine and also from its manifold. The relation is not only narrow but unbreakable. The crankpin arrangement is shown and the suction orders are logically deducible therefrom, establishing thereby an unbreakable relation between the crankpin arrangement and the form of the manifold."

Moreover, Barkeij expressly concedes in his patent that his disclosures of crankshaft arrangement are neither original nor novel. He states, after referring to the drawings of his patent showing crankpin assemblies in his combinations: "Such a crankshaft causes perfect balance of the reciprocating parts in a V-type eight cylinder engine, as disclosed in Balancing of engines, 1907, by Archibald Sharp, or any other good book on engine balance, high speed engines."

We are not to be understood as stating, and do not hold, that the Delaunay-Belleville citations constitute complete anticipation of the later patents in evidence, or that the Barkeij patent in suit is wholly invalid by reason of these two references. We believe they are importantly illustrative of the state of the prior art at the time that Barkeij conceived the invention that he later claimed in his patent under consideration in this suit, and the effect of these two early disclosures is to relegate subsequent improvers, like Barkeij, in the art of inlet manifolding for multiple-cylinder internal combustion engines to specific forms shown with expressly defined structures.

The work which followed Delaunay-Belleville and which eventuated in the accused manifold of the defendant company is to a considerable extent attributable to one David E. Anderson, although the evidence also shows that many other workers in the Cadillac and Ford organizations contributed to important engineering and structural features that are found in the alleged infringing manifold.

Under date of June 3, 1930, and upon his application filed October 8, 1927, Anderson obtained a patent, No. 1,761,958, for

"Dual Intake Manifold," but preliminarily to our consideration of it, attention should be directed to Patent No. 1,285,129, which had been granted previously, on November 19, 1918, to George N. Goodrich, for "Multicylinder Engine." We think it unnecessary to discuss this reference in detail or further than to state that, applying and following the teachings of Delaunay-Belleville, it discloses, expressly specifies, and directly illustrates a method of overcoming in eight-cylinder motors of the V-type the double inertia effects that had unbalanced fuel distribution and retarded the use of such engines with a four-throw 90° crankshaft in the automobile industry. It is also noteworthy that Figure 1 in this Goodrich patent, issued almost eight years before the earliest date of invention testified to by Barkeij, shows at (b) a carburetor (probably of the up-draft type in view. of the record, which shows that the down-draft carburetor now in use was unknown as late as the latter part of 1928) located centrally between the groups of cylinders and over the "valley" of the V. Of course there is not and cannot be any claim of invention by the complainant Barkeij in this action of any carburetor. His contributions are limited as an improver of manifolding per se. The attitude of Barkeij as to the limited patentable scope and classification of his concept was early stated by him in Paper 35 of his application filed April 13, 1926, when, under date of September 10, 1927, he stated:

"It is again repeated here, that the order and direction of the suction periods depend also upon the form of the inlet manifold, and that this relation is the first factor in any gasdistribution system. The square section, right angles, distances, number of curves, are of importance too, but the P. O. seems to overlook the fact, that this geometrical arrangement depends again for a great deal upon this first factor. Just reason! The patent to Swan (for his *first* application,) No. 1,636,721 shows clearly a *single* zone of distribution, like his second patent 1,536,044 and the description clearly considers the *form* of the *single* zone and suction order as. the 'fulcrum' for the uniformity of the mixture and the uniform volumetric efficiency of the cylinders. The square cross section has been used many years before 1921 and *has been suggested* in the litterature *several times*. Applicant does not consider it necessary to repeat the entire old . art.

Many applicants do this to make an impression by a verbiage which is very impressive. It is however scientific to show the essentials of an invention without any verbosity. It is high time that class 52 be rearranged and separated from gasdistribution systems, systematically arranged. It is impossible to see a distinct line in this class now. Everything seems to be put in class 52, when if the P. O. does not know what to do with it. (carburetors, manifolds (inlet and exhaust) cylinder arrangement, blowers, etc.) There does not seem to exist such a thing as a separate class for a manifold system or gasdistribution system. Why not make a subclass?"

We think that the Goodrich disclosure tends strongly to negative some of the major contentions of the complainant, notably one that is directed to minimizing the practicality of the so-called Ridgeway manifold.

The Ridgeway manifold system was physically produced in evidence, and it is undeniably proven beyond all reasonable doubt, by both the oral testimony of Mr. Ridgeway, who appeared personally, and by unquestionable documentary evidence, to have been made and publicly, and to a moderate extent satisfactorily, used in a V8 LaSalle automobile having an angled four-ported cylinder block on each side, in the latter part of 1928 and early part of 1929. This was several years before complainant conceived and adequately disclosed or in any way reduced to practice any patentable manifold system that can be read upon the Ford construction accused of infringement in this action. The Ridgeway device consists of a duplex updraft carburetor. Each barrel of the carburetor feeds fuel into a separate, independent manifolding system. Above this duplex carburetor are attached and cooperating risers that connect or open into two longitudinal passages or pipes, which two systems of passages or pipes extend lengthwise midway the cylinder blocks. One of the systems of lengthwise passages feeds through connecting horizontal pipes the two inside cylinders in one cylinder block and the two outside or end cylinders in the other cylinder block. The other system of passages or pipes, in the words of Mr. Ridgeway, "does the same thing in looking glass symmetry, just reversed." Except in design detail and the up-draft carburetor this early Ridgeway manifolding system was substantially like that

which we find in the Ford manifold that is claimed by complainant to infringe the patent in suit. If defendant's manifolds could be found to infringe Barkeij's patent (which they do not), then by the same token Ridgeway's manifolds antedate the subject matter of the Barkeij patent that is pertinent in this suit.

Coming now to consider Anderson, No. 1,761,958, this court has not merely had the patent before it, but the inventor and patentee himself appeared as a witness and testified in detail as to his work relating to the invention embodied in his patent. His oral testimony is corroborated by irrefutable documents, drawings, and physical structures. We find from both the oral and the documentary evidence in the record that the structure which Anderson disclosed in his patent was conceived by him on September 3, 1924, when he made drawings and sketches wherein he graphically represented methods and means of intake manifolding internal combustion V-type eight-cylinder engines with both single and double carburetors, substantially as shown in his patent, No. 1,761,958.

The work was done by Anderson while he was connected with Cadillac Motor Car Company, which at that time had upon the market Model 63 V8 motor with 90° crankshaft similar to that used in the accused Ford structures. From the time that Anderson conceived the dual intake manifold shown in his patent until the Cadillac V8, containing a dual manifold embodying the substance of the accused Ford dual manifold system, was released for production in the year 1935, the work of perfecting the so-called Ridgeway and Anderson manifolds progressed without interruption.

In the course of these incessant activities by the Cadillac Company, one of its engineers, Clarence V. Crockett, Jr.; as early as February 11, 1926, made sketches of dual manifolding systems which are in the record and which show substantially the subject matter of the patent in suit that is involved in this action, and illustrate the same features in substantially the same manner and form that Barkeij shows in Figure 3 of the patent in suit. Figure 3 is a form of the Barkeij structure involved in this litigation and is the form which complainant states has been adopted by the defendant. These Crockett drawings, with those of Anderson already mentioned, were delivered to the patent section of the General Motors Corporation (the parent company of Cadillac Motor Car Company) by Anderson with a covering letter dated March 11, 1926, requesting that the application for patent on the manifolding systems shown be started in Anderson's name.

The drawings shown in Anderson No. 1,761,958 do not include Crockett's sketches, which show the primary pipes or passageways longitudinally midway the two banks of cylinders the same as in Barkeij's patent under consideration. Anderson's patent shows the primary conduits transversely the two cylinder blocks. The explanation made by Anderson for the omission of Crockett's sketches is that Anderson's were used alone to facilitate valve tappet adjustment by mechanics working in between the cylinder blocks. Regardless of this omission, the overwhelmingly established fact is that the substance and essence of the patent in suit, except the down-draft carburetor feature, was conceived and reduced to practice in March, 1926. Curtiss Aeroplane & Motor Corporation v. Janin, 2 Cir., 278 F. 454. This was prior to any attempt that was made by Barkeij to reduce to practice any conception of his patent which he claims in this suit is infringed by the defendant. Even if the dates of the earliest Barkeij drawings and disclosures of what complainant claims are proof of his conception of the invention shown by the patent in controversy are considered, to wit, those of April 1, 1926, and April 8, 1926, in the record as Exhibits C and D, nevertheless, the Cadillac Motor Car Company and its then engineers Anderson, Crockett, Arnold, and others, as well as Ridgeway and Cox on behalf of the Cadillac Company, must beyond all reasonable doubt be held to have preceded Barkeij in the invention of all dual intake manifolding systems for internal combustion engines that are involved in this action.

The Anderson patent was repeatedly cited by the patent examiner in opposition to Barkeij's disclosures, and as late as November 2, 1934, the Patent Office refused to recognize any invention by Barkeij over Anderson.

It is not clear from the Patent Office records in evidence as to why the Anderson reference was ultimately held to have been overcome in the Barkeij specifications and drawings. It was probably because

Figure 3 of the patent in suit was first shown by Barkeij with Figure 6 on March 25, 1935, and it was then concluded that the specific form of manifold and down-draft carburetor thus shown warranted the removal of Anderson's patent from the picture. This seems to be the only justification for the action of the Patent Office, because as late as March 5, 1935, the examiner, notwithstanding Barkeij had the preceding November shown and specified down-draft carburetion, Figure 2(b), in relation to Figure 3 structure, stated that Barkeij had presented "no allowable generic claim, and hence applicant must limit his claim to those all of which read on a single species," and further at that time cited Ford Service Bulletin, January-February, 1934, page 138, as anticipating claims based upon Figure 3 of the patent in suit.

■ Upon the record thus made, we must, and do, indulge the presumption of validity that has attached to the patent by reason of its having been granted. But the presumption is overthrown beyond all reasonable doubt by the disclosures in evidence before this court which were unknown and undisclosed to the Patent Office. Alexander Anderson, Inc., v. Eastman, D.C., 16 F.Supp. 513, 515.

■ The witness Anderson also gave positive testimony, adequately substantiated, which clearly showed that the Ford intake manifold accused of being an infringement of the patent in suit was seen, examined, and tested by him as early as November 11, 1932. Such a manifold, with a Stromberg down-draft carburetor equipment, was, about the same time, installed by Anderson in a Ford vehicle and test run by him and others associated with him in the Bohn Aluminum & Brass Corporation of Detroit, Michigan, and upon satisfactory performance was demonstrated to officers in the engineering department of the defendant company. The Ford automobile thus equipped was shortly thereafter driven around and about Detroit, Michigan, and in May, 1933, to Indianapolis, Indiana, where it was publicly exhibited. The car with the accused manifolding equipment was operated by or under Anderson for eight or nine months and for a distance of at least 20,000 miles. This use was in the regular course of commerce, and instead of there being any concealment of the automobile thus equipped the car was purposely driven to places where the general public assembled especially to examine and inspect automobiles with a view to buying for ordinary and usual transportation. It was clearly a public use, under the Ninth Circuit decision in Paraffine Companies v. McEverlast, Inc., 1936, 84 F.2d 335. This public use, lacking a few months in point of time to invalidate the patent in suit under the fifth subdivision of section 69, title 35 U.S.C.A., nevertheless, when considered with the continuous work in the Cadillac Company that had been carried on for eight years previously to adapt and perfect manifolds substantially like the accused Ford construction, shows beyond doubt that Barkeij was not the originator or first inventor of the dual manifolds which have been and are used in the Ford V8 automobiles, and consequently under the fourth subdivision of section 69, supra, has no right herein to an injunction against the defendant company.

The defendant company began designing the Ford V8 engine in 1929, and with more or less continuity went forward with the development until March, 1932, when the commercial car was placed on the market. Manufacture began in October, 1931. This automobile was equipped with single-type intake manifold and single carburetor. It was not entirely satisfactory from an engineering standpoint, due to lack of evenness of power impulses in the various cylinders. This was chiefly attributable to the unavailability at the time of any suitable down-draft carburetor. The correction of this fault from a scientific point of view did not present a difficult problem. A dual system of independent manifolding of the cylinders which would more effectively distribute power was, in the light of the known state of the art, quite readily conceived and charted. The dual system of manifolding, as has been shown earlier in this memorandum, was known and practiced in relation to V8 motor cars prior to the making of any of complainant's sketches or drawings of April, 1926. The available and serviceable space in the Ford engine in which to construct the system did, however, present design, pattern, and foundry problems that were mechanically grave and complex, and they continuously engaged the attention of the defendant from October, 1931, until the accused dual down-draft manifold system was presented to the public with the 1934 model of the Ford V8.

The alleged infringing structure was first actually produced, installed, and tested in motor cars about the latter part of February, 1932. The drawings of this Ford construction are indisputably proven to have been made on February 9, 1932. These show almost the exact passage arrangement shown by Figures 3 and 4 of the Barkeij patent in suit. There are two risers corresponding with $P^1$ and $P^2$ of Barkeij's Figure 3 of the patent in suit. One leads into the primary longitudinal passage, identical with passage A of Barkeij, which connects at the right-hand end to a transverse arm or branch extending to the end cylinder in one bank and the intermediate cylinder in the other or opposite bank, and at its left-hand end this primary lengthwise passageway is also connected by oppositely extending transverse arms to the left end cylinder in the first bank and the other intermediate cylinder in the second bank. In like manner the other riser leads to another independent longitudinal primary passage which at its left-hand end transversely branches to the end cylinder in one bank and oppositely to the intermediate cylinder in the other bank, and at its right-hand end similarly to an end cylinder in one block and oppositely to the intermediate cylinder in the other block.

The February 9, 1932, Ford construction placed the two longitudinal passages side by side as Barkeij does in Figure 3 of the patent in suit.

This activity by the defendant company was a conception and reduction to practice by the Ford organization that antedates any invention by complainant of any subject matter of the patent in suit that is involved in this action. The conclusion just stated would follow even if complainant could base any invention upon his application filed September 7, 1932, being Serial No. 632,006, but in our opinion no pertinent feature of the patent in suit can be based upon any sketch or disclosure earlier than those contained in the file wrapper and contents of application filed December 18, 1933.

The complainant states in his patent that his application therefor which he filed July 18, 1934, is a continuance of his earlier application Serial No. 632,006 of September 7, 1932. The record before the court does not establish such continuity of action by Mr. Barkeij, relating to any manifold or structure that is pertinent in this suit.

His first application, that of April 13, 1926, being Serial No. 101,715, does not disclose, specify, or illustrate any manifold system that, in the light of the prior art, can be read upon the accused structure, and the two previously mentioned drawings of April 1 and April 8 respectively of 1926 are also fruitless as aids to establish pertinent invention against the earlier conception and proven reduction to practice by others than Barkeij that have already been discussed. Christie v. Seybold, 6 Cir., 55 F. 69; Automatic Weighing Machine Co. v. Pneumatic Scale Corporation, Ltd., 1 Cir., 166 F. 288; Harper v. Zimmermann, D.C., 41 F.2d 261; Wilson & Willard Mfg. Co. v. Bole, 9 Cir., 227 F. 607. Even if they were made in April, 1926, they are entitled to no more dignity as inventions than the Crockett sketches which unquestionably were made the previous February and which more nearly approach a legal reduction to practice than either of the two Barkeij sketches.

The File Wrapper and Contents of the application of April 13, 1926, shows that on March 23, 1931, the patent examiner held that no claim made by Barkeij up to that date was allowable. Applicant was given until August 13, 1931, to present matters to save his application from being declared abandoned. The only action taken thereafter by Barkeij in his first application was to file a petition for reconsideration on April 20, 1931, which was denied by the Commissioner of Patents on May 8, 1931. It is thus clearly shown, and indeed is admitted by Barkeij, that his first application was abandoned. The next thing done in the Patent Office in the prosecution of Barkeij's patent claims was the filing by him of the September 7, 1932, application, Serial No. 632,006. This was preceded by a communication from Barkeij from Germany to the Patent Office dated July 27, 1932. It thus appears that for a period of at least eleven months Barkeij was inactive and showed no diligence whatever in the matter of his patent application. During this time the defendant company, without any aid or assistance from complainant and without any knowledge of his work or disclosures relating to his abandoned first application, was developing, reducing to practice, and commercially producing its V8 motor cars with the con-

struction that is alleged to be an infringement of Barkeij's patent No. 2,012,902. This situation alone justifies a finding that defendant company and not Barkeij is the first inventor of the accused manifolding system. Hull v. Davenport, Cust. & Pat. App. 1937, 90 F.2d 103. The conclusion just stated is further warranted and strengthened by the fact that in the application filed September 7, 1932, there is no adequate disclosure or allowed claim to manifolds shown by Figures 3 and 4 of the patent in suit. The first Barkeij application that can be considered in continuity with any manifold that is alleged to be infringed by defendant, i. e., the construction shown in Figures 3, 4, and 6 of the patent in suit, is that filed December 18, 1933, Serial No. 702,970.

An opinion has been expressed earlier in this memorandum that notwithstanding the presumption of validity that has attached to the Barkeij patent in suit because of its issuance by the Patent Office, the evidence produced in court and which was not presented to or considered by the Patent Office clearly and beyond all reasonable doubt shows the patent to have been anticipated by earlier inlet manifolds of V8 motor automobile construction. But even if such conclusion could be successfully removed, nevertheless the fact clearly remains that no infringement of the patent in suit has been established. All that could be contended by Mr. Barkeij is that his patent is an extremely limited one in the light of the prior art shown by the evidence before the Patent Office as well as that produced to the court. Delaunay-Belleville, Goodrich, Anderson, and other patent references in the record, with Ridgeway's, Crockett's, LaSalle's, Cadillac's, and Ford's contributions to the field in which Barkeij was working, restrict and circumscribe any claims in the Barkeij patent in suit narrowly and in such manner that infringement can be found only in approximate copies of the structures shown by Figures 3 and 4 of the Barkeij patent. Eibel Co. v. Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 328, 67 L. Ed. 523.

A comparison of the structural embodiment of the patent in suit as disclosed in the pertinent figures of it with the defendant's accused duplex manifold entirely removes any basis for a finding of infringement in this case.

Contrary to designing and placing the "independent piping" down in the V-shaped "valley" between the two slanting cylinder blocks and so that the ends of connecting transverse manifold pipes seat against the inner inclined walls of the cylinder blocks, as shown in Barkeij's Figure 4, the Ford engine block casting is made with a flat top surface through which the inlet ports for the several cylinders emerge, and the accused manifold casting seats squarely upon this flat surface. This is not merely a difference in form, but the defendant's construction also departs from Barkeij in that difficulties which exist in maintaining a tight joint between the pipes and the casting in the patented construction are not present in the Ford system.

Moreover, the arrangement of the passageways themselves differs materially in the two structures. In Barkeij the longitudinal pipes $A^1$—$A^2$ and $A^3$—$A^4$ are in different vertical planes throughout, while in Ford's design the longitudinal passageways lie one directly below the other and an offset is provided at the center of each for accommodation of the riser leading to the lower passageway. There is further dissimilarity in the relationship of lengthwise passageways to transverse branching passageways running to the inlet ports. In the patent each of the independent pipings assumes an H-like form with a cross wall at each end of each piping standing directly at right angles to the longitudinal passageway, while in the accused manifold the transverse passageways in each of the two units branch from different points along the longitudinal passageway.

This difference in branching, according to credible opinion evidence in the record, connotes dissimilar functioning in the two structures, so that it would be impossible to operate the Ford V8 efficiently with the structures that are embodied in the patent in suit.

There are more bends from the riser to the intake valve of the engine around which the gas travels in the operation of the Ford motor than are to be found in Barkeij's Figure 4. These modifications, both in structure and function, clearly negative infringement by the defendant company.

To summarize, it is our opinion:

1. That Barkeij is not the inventor of the accused Ford intake manifolds or any

of the manifolding system of the defendant's automobile construction.

2. That the Barkeij patent in suit, No. 2,012,902, and each of the claims in issue, is invalid and ineffective as to accused structures of the defendant company, and has been anticipated by the so-called Ridgeway manifolds and by manifold systems manufactured by the Cadillac Motor Car Company and by defendant Ford Motor Company.

3. That when limited by the prior art shown in the record before this court, no claim of patent No. 2,012,902 that is in issue in this suit has been infringed by the defendant or by any inlet manifold in any of the Ford V8 motor vehicles.

4. That the bill of complaint be dismissed, with costs to defendant.

The foregoing, with such additional proposals as may be submitted by solicitors within twenty days from notice hereof, in conformity with the views hereinbefore stated, and which shall be adopted by the court, shall constitute the Findings of Fact, Conclusions of Law, and Direction for Decree herein, in compliance with Equity Rule 70½, 28 U.S.C.A. following section 723.